Bruce LIPPO, etc., Plaintiff,

v.

MOBIL OIL CORPORATION,
Defendant.

No. 81 C 775.

United States District Court,
N.D. Illinois, E.D.

July 21, 1988.

Michael R. McKenna, Ellen G. Robinson, Chicago, Ill., for plaintiff.

Fred E. Schulz, James M. Mulcahy, Timothy G. Nickels, Wildman, Harrold, Allen & Dixon, and Robert C. Fox, Arthur C. Hofmann, Mobil Oil Corp., Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This is the final act of a tortuous litigation brought by Bruce Lippo ("Lippo") against Mobil Oil Corporation ("Mobil")—litigation that wended its way from this District Court (where the litigants appeared before two since-retired judges, Honorable Bernard Decker and Honorable Thomas McMillen) to the Court of Appeals, then back down to the District Court again until all the principal claims had been disposed of.[1] What is at issue now are the attorneys' fees recoverable by Lippo related to the litigation.

This Court has conducted a six-day evidentiary hearing (the "Hearing") on the subject, one unfortunately marked (and marred) by the same degree of bitterness between opposing counsel that appears to have permeated the underlying litigation and, indeed, the entire relationship between

---

**1.** Judges Decker and then McMillen handled all phases of the litigation at the trial court level until, following the remand by the Court of Appeals (see its opinion at 776 F.2d 706 (7th Cir.1985)), the case was reassigned to this Court's calendar. At that time the parties settled all open substantive issues (see Finding 101), leaving the award of fees to Lippo as the only surviving matter.

Lippo and Mobil.[2] Following the Hearing the parties have submitted proposed findings of fact ("Findings") and conclusions of law ("Conclusions"). In accordance with Fed.R.Civ.P. ("Rule") 52(a), the following Findings and Conclusions reflect the decision of this Court on the relevant issues in the case.[3]

### Findings of Fact

1–99. To minimize the disputes posed by the parties' respective submissions of proposed Findings and to avoid repetition, this Court adopts as its Findings 1–99 the parties' Uncontested Facts statement in their Amended Final Pretrial Order ("FPTO"), bearing the identical paragraph numbers.[4] Those Findings are reproduced immediately below.

### UNCONTESTED FACTS

#### The Parties

1. Plaintiff Bruce Lippo, d/b/a "Walden–Woodfield Service Station" ("Lippo") is an Illinois resident.

2. Defendant Mobil Oil Corporation ("Mobil") is a New York corporation with its place of business located in Fairfax, Virginia.

#### The Filing of the Lawsuit

3. The single incident giving rise to this litigation was Lippo's undisputed sale of non-Mobil gasoline on September 29, 1980. Lippo's conduct was a default under his franchise agreement with Mobil. The trial and appellate court held that Lippo's default was curable under his franchise agreement.

4. Lippo filed this action on February 13, 1981. Lippo's five count complaint stated claims for promissory estoppel, fraudulent misrepresentation, breach of contract, waiver, and a claim for violation of the PMPA. He sought equitable relief barring the termination of his franchise with Mobil and damages resulting from his fear of potential termination.

5. Mobil answered Lippo's complaint and counterclaimed, stating claims for trademark and service mark infringement, false representation under the Lanham Act, unfair competition, unfair trade practices and breach of the franchise agreement, and violation of the PMPA.

#### The Preliminary Injunction

6. Lippo requested and received a temporary restraining order upon the filing of his lawsuit, which was extended until February 26, 1981.

7. Mobil and Lippo filed motions for preliminary injunctions and, on February 26, 1981, the court conducted a full evidentiary hearing.

8. The temporary restraining order was continued until the court issued its memorandum and opinion. On March 3, 1981, Mobil filed a memorandum in support of its motion for a preliminary injunction and in opposition to Lippo's cross-motion. On March 5, 1981, Lippo filed his brief entitled "brief in support of [Lippo's] motion for extension of the temporary restraining order."

9. On March 5, 1981, Judge Decker entered the court's memorandum opinion and order granting Lippo's request for a preliminary injunction and ordered the parties to "continue to adhere to the terms of the franchise relationship as set out in the [franchise agreement]."

10. Prior to the entry of the preliminary injunction on March 5, 1981, the parties conducted three depositions. Mobil took

---

2. In this case Lippo's claim stemmed from Mobil's proposed termination of his service station franchise. When Mobil later did not renew the franchise at the end of its term (which had been continued in effect under injunctive relief granted by Judges Decker and McMillen), Lippo sued Mobil for that too. That action also went to the Court of Appeals, and Lippo was unsuccessful on that claim (see the opinion at 802 F.2d 975 (7th Cir.1986)).

3. To the extent (if any) the following Findings may be deemed conclusions of law, they shall also be considered Conclusions. In particular,

there are a number of places in the Findings where footnotes are used to set out the operative legal principles (including case citations and quotations) that support the factual determinations in the text. That kind of convenient explanatory treatment does not, of course, alter the nature of those footnoted materials as Conclusions. In much the same way, to the extent (if any) matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings.

4. Lippo's relevancy objections to Findings 48, 49 and 90 are overruled.

the deposition of Lippo and Lippo took the depositions of Lippo's then present and past marketing representatives, Boehmke and Davies.

*The Summary Judgment in Lippo's Favor*

11. On July 8, 1981, Mobil moved for summary judgment on Lippo's complaint and on Mobil's counterclaim. In support of its motion, Mobil submitted Lippo's deposition transcript, the three page affidavit of James F. Olsen, the transcript of the preliminary injunction hearing and a legal memorandum.

12. On July 27, 1981, Lippo was granted leave to extend the time in which to file his answering brief to Mobil's motion for summary judgment.

13. On August 11, 1981, Lippo filed a response to defendant's motion for summary judgment and Lippo's cross-motion for partial summary judgment. In support of his motion, Lippo filed his affidavit, part of the preliminary injunction hearing transcript, the affidavit of an employee (Guy Waldorf) and a supporting memorandum.

14. On August 19, 1981, Mobil was granted leave to extend the time in which to file its reply brief in support of its motion for summary judgment.

15. On September 3, 1981, Mobil was granted additional time to file its reply brief in support of its motion for summary judgment.

16. On September 18, 1981, Mobil filed its memorandum in response to Lippo's summary judgment motion and its reply to plaintiff's response to Mobil's motion for summary judgment.

17. On September 28, 1981, Lippo was granted additional time in which to file his reply brief on the motion for summary judgment.

18. On September 29, 1981, Mobil filed the deposition transcript of Richard J. Roach.

19. On October 13, 1981, Lippo filed a statement in lieu of a reply brief referring the Court to his previously filed memorandum in support of an extension of the temporary restraining order.

20. On January 14, 1982, the Honorable Thomas R. McMillen entered the court's decision in Lippo's favor on his breach of contract and PMPA claims and on Mobil's counterclaims. Summary judgment was granted in Mobil's favor on Lippo's claims for promissory estoppel, fraudulent misrepresentation and contract waiver.

*The Judgment Order*

21. Judge McMillen's January 14, 1982 memorandum opinion provided that Lippo could serve and file a proposed judgment order by January 24, 1982.

22. On March 5, 1982, Mobil was granted leave to file its objections to the proposed judgment order. Briefs in support of, and in opposition to, the proposed judgment order were filed.

23. On May 3, 1982, Judge McMillen entered a judgment order and permanent injunction barring Mobil from interfering with, altering or discontinuing Lippo's franchise.

*Lippo's April 13, 1982 "Motion For Order To Show Cause Why [Mobil] Should Not Be Held in Contempt"*

24. On April 13, 1982, Lippo moved for a rule to show cause against Mobil. Lippo's motion contended that Mobil's issuance of a notice of non-renewal, dated March 26, 1982, constituted a breach of the terms of the franchise agreement and was in violation of Judge Decker's preliminary injunction. On April 27, 1982, Mobil filed a brief in opposition to Lippo's motion for a rule to show cause.

25. On April 29, 1982, Judge McMillen denied Lippo's motion for failure to show a violation of either the preliminary injunction or the franchise agreement.

26. On May 10, 1982, Mobil received a notice of motion, motion and brief in support of motion for a rule to show cause. Lippo did not present the motion or file the brief, but did file another brief in support of a motion for reconsideration of the court's April 29, 1982 denial of Lippo's initial request for the issuance of a rule to show cause against Mobil.

27. On May 14, 1982, Lippo presented his motion for reconsideration. The court denied Lippo's motion.

*Mobil's Motion to Consolidate*

28. On June 2, 1982, Lippo filed a separate action against Mobil based on the non-renewal. On September 14, 1982, Mobil moved to consolidate both cases. On September 30, 1982, Mobil's consolidation motion was denied.

*Discovery*

29. On February 13, 1981, pursuant to Rule 30(a), the court granted plaintiff leave to take the deposition of the employees and agents of defendant, including Ned Davies and Greg Boemhke, prior to the expiration of 30 days from the service of summons and complaint on the defendant.

30. Lippo served and filed his first request for the production of documents on February 20, 1981. This discovery requested, *inter alia* "[a]ll correspondence, memorandums [sic], reports or agreements relating in any way" to Lippo, any other franchisee in Illinois, and any alleged replacement for Lippo. Lippo also requested "[a]ll speeches or seminars given by officers, directors, employees or agents of [Mobil] to the employees of [Mobil] concerning the [PMPA]."

31. On February 23, 1981, Mobil served and filed its first request for production of documents, a notice of deposition, an amended notice of deposition and it's first set of interrogatories to Lippo.

32. On February 24, 1981, Mobil filed its objections to certain production requests appended to the deposition notices of Messrs. Davies and Boemhke.

33. On March 23, 1981, Lippo filed his objections to Mobil's interrogatories and notice to produce.

34. On March 30, 1981, after Mobil objected to producing documents requested by Lippo, Lippo moved to compel the production of documents. Lippo's motion was granted in part and denied in part.

35. On April 27, 1981, Lippo served Mobil with Lippo's first set of interrogatories and his second request for the production of documents, requesting Mobil's "market-ing representative training manual, outline, seminar minutes, or other documentation used by Mobil in the training of its marketing representatives ..." and "all documentation reflecting purchases by Mobil other than Mobil refineries."

36. On May 15, 1981, Mobil filed its objections to the request for production of documents, and its objections to certain interrogatories.

37. On May 26, 1981, Lippo was granted an extension of discovery cutoff for thirty days.

38. On June 4, 1981, Lippo filed his answers to the first set of interrogatories.

39. On July 8, 1981, Lippo presented his motion to compel the production of the documents described in his second production request and for sanctions. At the Status Hearing on July 8, 1981, Mobil was required to reply to Lippo's motion to compel by July 22, 1981, and to file answers to interrogatories within two days.

40. On July 10, 1981, Mobil filed its answers to Lippo's first set of interrogatories and its response to Lippo's second production request.

41. On July 15, 1981, Lippo withdrew his motion for sanctions.

42. On October 13, 1981, Lippo served Mobil with a request for the production of documents. This notice requested that Mobil produce statements and credit card documents reflecting the identity of all customers who had purchased gasoline from Lippo's service station between September 29, 1980 and October 10, 1980.

43. On October 16, 1981, Mobil filed its objections to Lippo's production request.

44. On December 4, 1981, Lippo served Mobil with a request for the production of all documents generated between 1980 and 1982, inclusive, which "reflect[ed] the selling price of all grades of gasoline at the Mobil service station located at Huntington and Algonquin [r]oads in Hoffman Estates, Illinois." He also served Mobil with a request to admit facts relating to insurance coverage for all Mobil dealers. Mobil objected to this discovery, and Lippo filed a

motion to compel on March 3, 1982. Lippo's motion to compel was denied.

45. On April 26, 1982, Mobil filed a supplemental production request and supplemental interrogatories.

46. On June 10, 1982, Lippo was granted leave to complete discovery and answer interrogatories by June 24, 1982, and Mobil was given until July 1, 1982 to complete discovery.

47. On June 16, 1982, Mobil filed its notice of deposition for the plaintiff, Bruce Lippo, and a supplemental production request.

48. On June 22, 1982, Mobil received supplemental interrogatories from Lippo asking whether Mobil had ever "been a party to any judicial, quasi-judicial or administrative proceeding, other than the instant matter, where the cure provision of the franchise documents was an issue." These interrogatories also asked whether Mobil contended that the "application of the cure provision to the sale of gasoline is uniquely novel to the instant proceeding." [Lippo objects based on relevancy grounds as this discovery relates to the issue of punitive damages for which no fee is sought]

49. Mobil objected to this discovery on June 29, 1981, and Lippo filed a motion to compel and appeared before Judge McMillen on July 9, 1982. Lippo contended he was pursuing his punitive damages claim with these supplemental interrogatories, and the court ordered Mobil to answer the interrogatories. [Lippo objects: relevancy]

50. On June 24, 1982, Lippo filed his response to Mobil's supplemental interrogatories.

51. On July 9, 1982, Mobil filed its motion to compel the production of plaintiff and his expert witness. On that date the deposition of the plaintiff and his expert witness were set by court order.

52. On August 19, 1982, Mobil filed its supplemental answers to Lippo's first set of interrogatories. Mobil also filed its answers to Lippo's supplemental interrogatories. On September 14, 1982, Lippo served upon Mobil a motion for sanctions for failure to answer the supplemental interrogatories. Judge McMillen referred the sanctions motion to Magistrate Sussman.

53. On October 22, 1982, Mobil filed its response to Lippo's motion for sanction with exhibits attached.

54. At a status hearing on October 25, 1982, Oral Argument on the motion for sanctions was set for November 17, 1982 before Magistrate Sussman.

55. On November 18, 1982, Magistrate Sussman ordered that Lippo modify his supplemental interrogatory No. 3, and that the Mobil file its answer to same within 30 days. He further ordered that no sanctions be granted.

56. On August 25, 1982, Mobil was granted leave to file its answers to supplemental interrogatories instanter.

## The Final Pretrial Order and Related Discovery

57. On June 10, 1982, the court ordered the parties to submit a final pretrial order by July 19, 1982. This was extended to August 3, 1982.

58. On July 26, 1982, Lippo moved to extend the time for compliance with the pretrial order. The court denied Lippo's motion. On July 30, 1982, Lippo filed his draft of the final pretrial order; Mobil filed its draft on August 3, 1982.

59. Mobil identified its witnesses in its pretrial order, which included Kehoe, Myers, Horel, Boyer, Kurz, Davies and Chowdhury; foundation witnesses included Denny, Savocchi and Carlton. Mobil's expert witnesses were identified as McKenna and Willis. On September 14, 1982, Lippo moved to strike that part of Mobil's pretrial order that disclosed certain witnesses or, in the alternative, to reopen discovery to permit the taking of their depositions. The court granted plaintiff leave to take these depositions.

60. On November 5, 1982, Lippo's motion to strike was granted to the extent of re-opening discovery pending completion of the pretrial order. Lippo's motion in limine as to reading orders to the jury was granted.

61. On December 10, 1982, Lippo's motion to modify the Pre–Trial Order was granted.

62. On January 4, 1983, Mobil filed its answer to plaintiff's supplemental interrogatory No. 3.

63. On January 6, 1983, Lippo filed notices of deposition for George Kurz, Robert McKenna and Stephen Willis.

64. On January 7, 1983, Mobil filed a request for admission.

65. On January 17, 1983, Lippo filed a notice to produce, and notices of deposition for W.F. Boyer, Abu Chowdhury, Thomas Kehoe and C.A. Meyers.

66. On January 25, 1983, Lippo moved for entry of the final pretrial order and for leave to file his brief in support thereof. The parties were directed to resolve the two differences remaining, and to file joint compliance with the final pretrial order within two weeks.

67. The parties filed a joint final pretrial order on February 17, 1983.

68. On February 14, 1983, Lippo filed a motion to compel discovery and for sanctions, which was referred to Magistrate Sussman.

69. On February 24, 1983, after oral argument, Lippo's motion to compel was granted and the request for sanctions was reserved until the final issues were determined.

70. On March 7, 1983, defendant filed a motion to compel the inspection of records, and plaintiff filed his response thereto and a motion for protective order.

71. On March 9, 1983, Magistrate Sussman granted defendant's motion to compel, and plaintiff's request for the production of price surveys.

72. On March 15, 1983, Judge McMillen overruled the plaintiff's objections to the Magistrate's Order.

73. On April 21, 1983, Lippo filed its supplemental response to supplemental interrogatories.

74. On May 11, 1983, Lippo filed its supplement to the final pretrial order. The defendant's motion to amend the final pretrial order was granted without objection.

75. Lippo, Stubenrauch, Pacquette, Waldorf and Hadesman—all witnesses named by the plaintiff in his pretrial order —were deposed at the request of defendant.

76. Lippo identified himself and his accountant, Rod Pacquette, as Lippo's expert witnesses in the final pretrial order.

77. On April 14, 1983, after Mobil deposed Mr. Pacquette, Lippo notified Mobil that Mr. Stubenrauch, who was named in Lippo's pretrial order as an occurrence witness, would also present Lippo's expert testimony. The pretrial order was not amended and Mr. Pacquette did not testify at the trial.

78. Mobil raised certain factual defenses in its pretrial order to plaintiff's claim for damages including, *inter alia,* (1) that Lippo's independent actions resulted in his business decline; (2) that Mobil's notice of termination caused neither the lost profits nor the diminution in value of Lippo's service station; (3) that Lippo's decline in gasoline sales caused his lost profits; and (4) that Lippo failed to mitigate damages.

*The Trial, Post–Trial and Punitive Damages Trial*

79. Pretrial motions in limine and to suppress evidence were filed by the plaintiff. The first was granted, and the latter taken under advisement. Mobil filed pretrial motions to suppress evidence and to strike the plaintiff's jury demand.

80. On April 14, 1983, defendant's motion to extend the trial date was denied.

81. On May 16, 1983, plaintiff filed his response to defendant's motion to suppress evidence, and plaintiff filed his notice to produce at trial.

82. On May 17, 1983, plaintiff filed his motion to suppress evidence.

83. On May 18, 1983, plaintiff filed his second supplemental response to supplemental interrogatories, and defendant filed its motion to suppress evidence.

84. On May 18, 1983, plaintiff filed his response to defendant's motion to strike jury demand.

85. On May 19, 1983, defendant filed its request to produce.

86. The damages trial began on May 18, 1983 and ended on May 26, 1983. After six days of testimony, the jury returned a verdict in Lippo's favor, awarding him damages of $45,000 for his lost profits and $22,500 for the diminished value of the service station.

87. At trial, Lippo established his lost profits through Lippo's foundation evidence and Mr. Stubenrauch's damages calculation. Mr. Stubenrauch determined the difference between the net profits received by the service station's repair operation as "damaged" by Mobil's notification, and those net profits which could have been expected for an "undamaged" repair operation during the period of loss. This determination was made by projecting the station's historical net profits over the period of loss.

88. Lippo also sought damages for an alleged diminished value of his repair operation resulting from Mobil's notification. This alleged loss in value was based on two offers to purchase Lippo's franchise made at two different points in time.

89. On June 3, 1983, Mobil filed a motion for judgment n.o.v. or for new trial with a supporting memorandum. Lippo filed his opposing memorandum on June 20, 1983, and also amended his complaint to conform to the evidence presented at trial. Mobil's post-trial motion was denied on July 13, 1983.

90. In January, 1984, the district court conducted a three day bench trial on Lippo's claim for punitive damages and directed a finding in Mobil's favor at the close of Lippo's case-in-chief. The district court denied Lippo's claim for punitive damages. [Lippo objects: relevancy]

*Appeal*

91. On February 1, 1984, Mobil appealed. Lippo did not file a cross appeal. Oral arguments were heard on February 29, 1985. On October 30, 1985, the Seventh Circuit affirmed the district court's summary judgment in favor of Lippo on the breach of contract and violation of the PMPA counts, but reversed the district court's grant of summary judgment in favor of Lippo on Mobil's counterclaims. The appellate court affirmed the district court's award of $45,000 for Lippo's lost profits, but reversed the award of $22,500 for the diminished value of the service station. The case was remanded to the district court with instructions that either the plaintiff accept a remittitur, the parties agree to a settlement, or the court conduct a new trial.

92. On December 6, 1985, Mobil filed a Petition for Rehearing and Suggestion for Rehearing *In Banc*. Lippo filed his Answer to the Petition for Rehearing, pursuant to court order, on January 10, 1986. On February 12, 1986, the petition for rehearing was denied.

*Attorney's Fees*

93. Mr. Marcus was engaged in written communication with Mobil prior to suit.

94. The plaintiff's attorney, Mr. McKenna, was graduated from the University of Illinois with a Bachelor of Science Degree in Mechanical Engineering, with honors, in June, 1971. He was initially employed as a summer research assistant at Argonne National Laboratory in Argonne, Illinois. In September, 1971, Mr. McKenna was retained by the Commonwealth Edison Company as a Mechanical Engineer, and served in various capacities, including mechanical project engineer, overseeing the construction of one of Edison's new power plants. While doing so, Mr. McKenna attended the Chicago–Kent College of Law, and received his Juris Doctor Degree in June, 1976. He was admitted to the Bars of the State of Illinois and the Northern District of Illinois in 1976. He was admitted to the Federal Trial Bar of the Northern District of Illinois upon its creation in 1983. He was recently admitted to practice before the U.S. Patent and Trademark Office as a patent attorney.

95. Lippo filed his first petition for attorney's fees and costs on January 23, 1984. Mobil objected and submitted its op-

posing memorandum. Lippo requested $105,020.00 in attorney's fees for services performed by Michael R. McKenna and $5,993.75 in fees for services performed by Ira J. Marcus. McKenna requested $18,072.50 for services rendered in 1981; $27,145.00 for services rendered in 1982; $51,650.00 for services rendered in 1983; and $8,152.50 for services rendered in 1984. Marcus requested $1,087.50 for services rendered in 1980 and $4,906.25 for services rendered in 1981. Plaintiff also requested $8,225.90 in costs and expenses.

96. On August 7, 1984, the trial court ordered plaintiff to file an amended fee petition because the original fee petition was excessive in that it included time spent on the unsuccessful claim for punitive damages. The trial court's Memorandum opinion is attached to the pretrial order as Exhibit B.

97. On September 6, 1984, Lippo filed an amended fee petition. In this amended fee petition, Lippo sought $106,777.00 in fees for Michael McKenna's services and Ira Marcus' services. In the amended fee petition, Marcus sought $1,087.50 for services rendered in 1980. McKenna and Marcus sought $22,975.00 for services rendered in 1981. McKenna sought $26,427.00 for services rendered in 1982; $45,025.00 for services rendered in 1983; and $11,262.50 for services rendered in 1984. Lippo also requested $7,123.76 in costs and expenses.

98. On July 22, 1986 Lippo filed a second amended petition for fees and expenses. This petition did not ask for a set award of fees, but claimed that Lippo should be compensated as follows:

| | |
|---|---|
| Michael R. McKenna | 1505 hours × rate of $125 — $200/hr. × multiplier of 1.5 — 2.5 |
| Ira J. Marcus | 73.75 hours × rate of $125 — $200/hr. × multiplier of 1.5 — 2.5 |

Lippo also requested costs of $7,035.49 in his second amended fee petition.

99. In his reply brief in connection with his second amended petition, Lippo reduced his claimed number of hours by 36 hours to the following:

| | |
|---|---|
| Michael R. McKenna | 1469 hours × rate of $125 — $200/hr. × multiplier of 1.5 — 2.5 |
| Ira J. Marcus | 73.75 hours × rate of $125 — $200/hr. × multiplier of 1.5 — 2.5 |

100. Following the Hearing, Lippo's tender of a final recapitulation (part of his April 30, 1987 filings) reflected a small further reduction, so that the final net hours requested came to 1505.9 hours (1456.4 for Michael McKenna ("McKenna") and 49.5 for Ira Marcus ("Marcus")). In terms of the years during which the services were rendered (rather than the categories to which McKenna assigned the time), the final figure was allocated this way:

| Year | Hours | Year | Hours |
|------|-------|------|-------|
| 1981 | 278   | 1984 | 362   |
| 1982 | 266   | 1985 | 54    |
| 1983 | 416   | 1986 | 130   |

That final figure, when multiplied by the relevant hourly rates in those years (with appropriate adjustments for the cost of money), would produce the "lodestar" fee. Lippo then seeks to apply a 1.5 multiplier to that amount.

101. After the Court of Appeals' decision (776 F.2d 706) and the resulting remand (see Finding 91), the parties' settlement involved (a) Lippo's voluntary dismissal of his claim for diminished value of the service station and (b) Mobil's voluntary dismissal of its counterclaim. That settlement was without prejudice to Lippo's claim for attorneys' fees. In light of the ultimate result of the litigation, Lippo's "prevailing party" status is limited to the categories set out in Conclusions 2 and 3.

102. In the course of the underlying litigation, Lippo's counsel placed heavy emphasis on what ultimately turned out to be an unsuccessful claim for punitive damages against Mobil. Though Lippo's counsel now purports to have eliminated the time spent on that claim from the fees petition, it appears highly likely that one of two things is true:

(a) There is much more time properly allocable to the punitive damages claim and therefore additionally excludable.

(b) McKenna's evaluation (if indeed he made any) of how much lawyers' time would justifiably be expendable in the

total case was seriously colored by the presence of the punitive damage claim—it was the only one that had enough potential for recovery to begin to call for anything even approaching the total time that McKenna put into this litigation as a whole.

Even giving McKenna the benefit of the doubt on that first alternative (see Finding 104), there is no question that the case was very much overlitigated in relation to what was at issue.

103. McKenna is a 1976 law school graduate with no special credentials other than his license to practice law. Since 1976 he has been a sole practitioner engaged in the general practice of law in Chicago. This lawsuit was McKenna's first jury trial in federal court and generated his first appeal to the Court of Appeals. Marcus was admitted to the bar in November 1971. His practice is in general business and corporate matters, with some emphasis on FTC franchise matters, but he has no litigation experience.

104. Numerous individual requests in McKenna's successive affidavits seeking fees were withdrawn after Mobil had interposed objections (see Mobil Proposed Finding 28). Many still-remaining items also appear open to serious question (see Mobil Proposed Findings 29–31). It is however extremely difficult to parse McKenna's fee application, with its hundreds of entries and its necessarily generalized descriptions of the activities involved, to determine whether each individual item is supportable. In this instance an overall review is far more appropriate. Among other reasons, the very assumption that McKenna has prepared an accurate accounting of his time actually spent (an assumption this Court makes), plus the very large amount of time (in relative terms) shown by that accounting, compel the conclusion that the expenditure of that time was totally unrea-

sonable in relation to the compensable subject matter of the litigation.

105. It is true that fees chargeable to an opposing party under a fee-shifting statute are not necessarily limited by the amount at issue, let alone the amount recovered.[5] But the reviewing court must never lose sight of the fact that the fees allowable are bounded by a requirement of reasonableness—and reasonableness in a damage action should demand the same kind of approach to litigation evaluation by a lawyer that would apply to handling a comparable action that did not carry the potential of fee-shifting with it.[6]

106. As Finding 103 has reflected, not only was McKenna a lawyer with only a few years of practice under his belt when he became involved in this case, but he was a sole practitioner. This Court does not of course intend to denigrate the work of younger lawyers, nor does it mistakenly equate the size of law firms with the quality of legal services provided. It is rather that nothing in McKenna's background equipped him to do the right kind of practical evaluation that should be involved in every substantial litigation engagement, and he lacked the benefit of access to more seasoned seniors in the same firm who could perform that task. Whether because of those factors or because he saw a "deep pocket" in Mobil and hence saw no need to treat the matter with a lawyerlike approach—by determining what level of effort (that is, time investment) was justified—the end result was that no such evaluation was made.

107. Nor did such practical and essential judgments as to what scope of services was reasonably justified in relation to what was at issue in the litigation—the kind of evaluation described in Finding 108—enter into McKenna's actual handling of the case. As a result McKenna caused or permitted the litigation to proceed out of control so far as time expenditure was involved.[7] By

5. See, in the 42 U.S.C. § 1988 civil rights action context, *City of Riverside v. Rivera*, 477 U.S. 561, 573–81, 106 S.Ct. 2686, 2693–98, 91 L.Ed.2d 466 (1986).

6. See *In re Central Ice Cream Co.*, 841 F.2d 732, 734–35 (7th Cir.1988).

7. It should be said parenthetically that whether or not Mobil's lawyers spent a comparable amount of time is not determinative. This case was obviously overtried on both sides, but only a limited degree of justification for such excessive handling by a lawyer can stem from an

way of example, and not with any attempt to be exhaustive:

(a) There is no way to justify as reasonable the expenditure by Lippo's counsel of 274 hours (the equivalent of seven to eight weeks' work) in preparation for a 37-hour trial.[8] Lippo's Proposed Finding 21 seeks to support that expenditure by breaking the preparation into various components, but that presentation is unpersuasive—and indeed it would stand a chance of being persuasive only to someone who has not tried any lawsuits of size.

(b) Nor can 335 hours for handling the appeal be found reasonable. It was not.[9]

108. Among the witnesses called by the parties, only Daniel Feldman, Esq. ("Feldman") disclosed a real understanding of the practice of law in terms of the reasonableness determination this Court must make. His testimony and supporting exhibits (P.Ex. 143, D.Ex. 121) formalized the kind of analysis that experienced practitioners often perform in a nearly-intuitive way:

structuring a budget of anticipated time for a litigated matter, taking into account all relevant factors (including, importantly, what is at stake—at what point the controversy no longer merits spending incremental time [10]), then reformulating the budget estimate in an informed way as the litigation proceeds. Feldman's approach in this case was thoughtful, totally credible and strongly persuasive.

109. Feldman's Affidavit Ex. A contained a listing of his original budget, McKenna's actual hours and what Feldman called his "outer bound of reasonableness." Based on all the evidence, this Court finds the following number of hours, rather than the time McKenna actually spent,[11] to be the reasonable total time in the compensable categories of activity—the time on which the assessment of reasonable fees against Mobil should be based: [12]

| Services | Hours |
|---|---|
| 1981 | |
| Preliminary Injunction | 60 |

---

opponent's having done so. Moreover, it would have been substantially more rational for Mobil to overprepare its side of the case, given the real potential for fallout effect vis-a-vis its other franchisees from an adverse decision, than for individual plaintiff Lippo to do so. In any event, because it is impossible for a court in hindsight to ascribe degrees of fault (which side was responding to which side's initiation of an overkill approach?), this Court has subscribed to the approach of Mobil's expert (see Finding 108), who took into account what he called "some nastiness" on the part of both litigants.

**8.** This is the same kind of informed evaluation just made in *Ustrak v. Fairman*, 851 F.2d 983, 987–988 (7th Cir.1988).

**9.** See n. 8.

**10.** Feldman's affidavit (P.Ex. 143, ¶ II) says:

I should put my bias on the record at the outset. I think lawyers tend to exceed the point of diminishing returns in preparing cases, and that there is a professional obligation to assess the probable costs and benefits of particular course conduct. Litigation has a tendency to take as much time as is available, since there is always something more one can do. Only a very important case in either dollars or effect justifies that approach.

That is not truly a bias—or if it is, it is one this Court shares. When we are in law school and working on law review or other research

projects, time is not a concern. Every nook and cranny must be explored. One of the most difficult lessons for the young lawyer is that, time having become money, compromises must be made between the desire for exhaustive exploration and the knowledge that there are practical limitations. Indeed some lawsuits, by their very nature and the stakes involved, can be tried (if settlement proves impossible) only in the "old fashioned" way: with little or no discovery, despite the risks inherent in that "fox-hunt" or "sporting" approach to litigation.

**11.** This type of reduction, where the fee claim is unreasonable because of such factors as those dealt with in these findings, is supported by such decisions as *Ustrak*, 851 F.2d at 987–988, *In re Central Ice Cream Co.*, 841 F.2d at 733–35 and *Charles v. Daley*, 846 F.2d 1057, 1075–77 (7th Cir.1988).

**12.** This table is drawn from Feldman's "outer bound of reasonableness" with two exceptions:

1. Because McKenna actually spent 60 hours rather than the 80 hours Feldman would have allowed for the work on the preliminary injunction, the former figure was used.

2. No allowance was made for the punitive damages budgeting included in Feldman's analysis (both litigants recognize the correctness of such disallowance, and it has just been reconfirmed in *Ustrak*, 851 F.2d at 988 ).

| Services | Hours |
|---|---|
| **1981** | |
| Summary Judgment and Judgment Order | 140 |
| **1982** | |
| Discovery and Pretrial Order | 160 |
| **1983** | |
| Compensatory Damages Trial | 140 |
| Post Trial Briefs | 40 |
| **1984** | |
| Appeal | 200 |
| TOTAL | 740 |

110. As for the reasonable rate for counsel's time, the rate applied throughout will be that for McKenna alone because:

(a) Marcus' contribution to the litigation was minimal.

(b) Marcus had no special expertise to offer that would justify a higher rate than McKenna for the latter's services during the same period, though Marcus was an older lawyer and had more years in practice.

(c) During 1980 and 1981 (when he rendered his services), Marcus' normal billing rates in fact coincided with McKenna's.

(d) All the time Marcus would reasonably have spent is included in the Finding 109 total.

As for McKenna (and hence Marcus too), the appropriate hourly rates for application are these:

| | | | |
|---|---|---|---|
| 1981: | $ 70 | 1984: | $100 |
| 1982: | 80 | 1985: | 100 |
| 1983: | 80 | 1986: | 100 |

111. Each rate referred to in Finding 110 is below what McKenna described as his normal hourly billing rate for commercial litigation during the same year. Instead the Finding 110 rates coincide with the figures testified to by Paula Uscian ("Uscian"), except that in 1981 (when Uscian testified to a $60 hourly rate for someone with three to six years' experience— the category McKenna then fit—and an $80 hourly rate for someone more experienced) this Court has adopted a rate midway between Uscian's two figures. Whatever

rates McKenna might be able to negotiate with his clients do not of course control the current determination. There is nothing in McKenna's background or his performance in this case that sets him apart from—and certainly there is nothing to set him above—the general rates to which Uscian testified.

112. Because Finding 110's historical hourly rates do not take into account the delay in payment of fees, an appropriate adjustment is required.[13] Just as the applicable hours and hourly rates are not properly a function of attributes peculiar to McKenna as an individual, but are rather to be based on those of the reasonable lawyer with comparable qualifications and experience, so too the cost of delay should not be personalized in terms of McKenna's individual situation. This Court thus rejects the testimony of Lippo's expert witness Robert Sherwin in that respect, and for the reasons stated at some length in the Appendix it finds the proper interest factor to be applied to the historical hourly rates referred to in Finding 110 is the prime rate from time to time during the period involved.

### Conclusions of Law

1. This Court has jurisdiction over the sole remaining issue in this action—the award of attorneys' fees under 15 U.S.C. § 2805(d)(1)(C). That statute entitles Lippo to "reasonable" fees to the extent he "prevails" in the action initially brought under 15 U.S.C. § 2805(a). Conclusions 2 through 5 deal with Lippo's status as a "prevailing party."

2. Lippo is clearly a "prevailing party" in this action with respect to his claim for injunctive relief and his compensatory damages claim for lost profits.

3. Because Lippo's compensatory damages claim for diminution in the value of the franchise was settled by its dismissal after the Court of Appeals' remand, in exchange for the dismissal of Mobil's counter-

---

**13.** All the considerations that inform such adjustments require a fairly extended discussion that does not comfortably lend itself to the format of Findings and Conclusions. For that reason the Appendix to these Findings and Conclusions sets out that discussion in the form more frequently encountered in judicial opinions. Accordingly this Finding 112 will simply state the end result of the analysis in the Appendix.

claim, Lippo might also be viewed as a "prevailing party" on that aspect of his own claim as well [14]—but it was a claim of minimal value, not justifying any material expenditure of time, and it has been fully taken into account in Feldman's testimony and in this Court's finding of the aggregate reasonable hours.

4. As for Lippo's ill-considered effort to hold Mobil in contempt, Lippo was not a prevailing party in the sense employed by *Hensley v. Eckerhart*, 461 U.S. 424, 441, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983) ("Plaintiff failed to prevail on a claim that is distinct in all respects from his successful claims"); and see *Ustrak*, 851 F.2d at 988.

■ 5. Although fees are recoverable under *Hensley* principles for the litigation of fee awards themselves (*In re Burlington Northern, Inc.*, 832 F.2d 430 (7th Cir. 1987)), this case does not justify such a award. Unreasonableness rather than reasonableness is the hallmark of Lippo's fee claim:

(a) Not only was his overall claim for hours expended substantially excessive in relation to the reasonable time required (a matter already dealt with in the Findings), but the hours he expended in preparation of that claim:

(1) involved an inordinate amount of time in preparation because of inadequacies in the original recordkeeping; and

(2) were occupied in substantial part in responding to Mobil's challenges that would not have been required but for errors and excessive claims on Lippo's behalf in the first place.

(b) His overall claim not only sought an unreasonably high hourly rate (a matter that would not itself call for disallowance of part of the claim) but, more importantly, included a really unsupportable request for a multiplier.

(c) As a result of the combined factors pyramiding the excessiveness of Lippo's fees claim, the amount of that claim beggars the substantiated recovery by Lippo.

It cannot fairly be said Lippo was a "prevailing party" on his fees claim. Such a conclusion would compel Mobil to pay Lippo's lawyer a substantial sum over and above the already unduly large amount it has been forced to pay its own lawyers for litigating the fees claim—an amount rendered that large in principal part because of factors attributable to Lippo. That would be a grossly unfair result. Accordingly that part of Lippo's claim ("fees on fees") is disallowed in its entirety. As *Muscare v. Quinn*, 680 F.2d 42, 45 (7th Cir.1982) put it:

From this review of the history of the litigation it is clear that the district judge had discretion to deny the plaintiff's second fee request in its entirety. "The exercise of discretion ... gives the district judge great leeway. If the fee claims are exorbitant or the time devoted to presenting them is unnecessarily high, the judge may refuse further compensation...." *Gagne v. Maher, supra*, 594 F.2d [336] at [ (2d Cir.1979) ]. See also *Lund v. Affleck*, 587 F.2d 75, 77 (1st Cir.1978).

Cf. *Burlington Northern*, 832 F.2d at 435–36 (approving a 35% reduction based on the claimants' relative success in obtaining the fee award sought—a sharp contrast to the situation here).

6. Based on the Findings and the preceding Conclusions, the reasonable fees allowable to Lippo (unadjusted for the delay factor) are these:

| Services | Hours | Rate | Unadjusted Fees |
|---|---|---|---|
| 1981 | | | |
| Preliminary Injunction | 60 | $ 70 | $ 4,200 |
| Summary Judgment and Judgment Order | 140 | 70 | 9,800 |

14. Lippo's Proposed Finding 3 would have it he was the "prevailing party" both on his compensatory damage claim and on his defense against Mobil's counterclaim. Because the Court of Appeals reversed one aspect of Lippo's original award, and because that item and Mobil's counterclaim were washed out for a zero recovery rather than the parties' going through a second trial, Lippo cannot have it both ways. Although this is a minor item in relation to the entire dispute, it exemplifies Lippo's overreaching efforts on every aspect of the fees claim. Advocacy is of course permissible and to be expected—but greed is (or should be) self-defeating.

| Services | Hours | Rate | Unadjusted Fees |
|---|---|---|---|
| 1982 | | | |
| Discovery and Pretrial Order | 160 | $ 80 | $12,800 |
| 1983 | | | |
| Compensatory Damages Trial | 140 | 80 | 11,200 |
| Post Trial Briefs | 40 | 80 | 3,200 |
| 1984 | | | |
| Appeal | 200 | 100 | 20,000 |
| TOTALS | 740 | | 61,200 |

7. As already stated, the Appendix sets out the appropriate methodology for applying the necessary delay factor to the unadjusted fees set out in Conclusion 6. Updated information is necessary from the parties to allow the final calculation of the fee award obtained by applying that delay factor to the figures calculated under Conclusion 6. To avoid excessive multiple calculations in that regard, counsel are authorized (a) to apply the average prime rate for a calendar year (weighted average is of course preferable) to all the hours spent by Lippo's counsel in that year and (b) to calculate the accrual of interest from each August 15 (45 days after the end of the year's mid-point); see the Appendix.

8. Lippo's Second Amended Petition also seeks an award of $7,035.49 in out-of-pocket expenses (the reimbursement of which is not limited to statutory costs under 28 U.S.C. § 1920). Mobil responds in this fashion to Lippo's Proposed Finding 37 making that request:

> It is virtually impossible to separate out Lippo's costs which were associated with his compensatory damage claim from those costs which were associated with his punitive damage claim. Mobil has addressed this issue in Mobil Ex. 124.

Again this Court lacks the necessary information to determine the appropriate financial award. For one thing, neither party has really spoken to the legal question whether 15 U.S.C. § 2805(d)(1)(C), the provision under which Lippo's current petition is brought, should be read as embracing non-statutory-cost items of expense within an award of "attorney's fees"—the conventional reading of the same term in 42 U.S.C. § 1988. If it is, then to the extent Lippo's request is greater than the amount that would be awardable as statutory costs, the request must be adjusted to conform to this Court's ruling on allowable attorneys' fees. And if the award is instead limited to "costs" as a statutory term of art, the claim will have to be fine-tuned to the statutory standard.

\* \* \*

To minimize further delay as well as the expenditure of still more lawyers' time, counsel are urged to try to reach agreement on the generation of the final figures to conform to these Findings and Conclusions. This case is set for a status hearing at 9 a.m. August 10, 1988 to determine what progress has been made in that respect and what further *short* timetable should be established to wind matters up.

## APPENDIX

Though the case law was somewhat slow in crystallizing on this point, it has for some time been settled that a plaintiff's counsel in a fee-shifting situation is entitled to an increment over and above historical hourly rates to compensate for the delay in collecting fees (see *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, — U.S. —, 107 S.Ct. 3078, 3082, 97 L.Ed.2d 585 (1987). To provide that increment, courts do frequently look to the lawyers' current billing rates instead (see, e.g., *Lightfoot v. Walker*, 826 F.2d 516, 523 (7th Cir.1987); *In re Burlington Northern, Inc.*, 810 F.2d 601, 608 (7th Cir.1986), *cert. denied*, — U.S. —, 108 S.Ct. 82, 98 L.Ed.2d 44 (1987)). But whenever they do that, courts should be keenly aware that such an approach is no better than a rough and ready (albeit often a highly convenient) surrogate for the proper goal of fee-shifting: placing the successful lawyer in the same position that he or she would have occupied had payment not been delayed until the end of the litigation.

In this Court's view, the delay factor should instead be approached directly and measured as precisely as possible, providing counsel with the present value of what he or she would have collected but for the delay in payment. That avoids the prospect of a windfall (for either side) stemming from the numerous factors that may

make the use of current rates a distorted measure of the proper recovery. For example:

1. To the extent that the increases in hourly rates may have outstripped the intervening interest rates (which should reflect the free market's combination of both inflation and the pure cost of money), lawyers are more than made whole by the use of current rates. Conversely, to the extent that hourly rate increases may have lagged behind the intervening interest rates, lawyers are rendered out of pocket if current rates are used.

2. If a lawyer becomes involved in a matter quite early in his or her career, later increases in that lawyer's hourly rates are primarily reflective of the lawyer's increased experience rather than the delay factor that should be the court's only concern (see *Ohio–Sealy Manufacturing Co. v. Sealy, Inc.*, 776 F.2d 646, 663 (7th Cir.1985)). Of course the *current* services of that lawyer may (and should) be billed at current rates to reflect their greater market value (in part a function of greater experience), but it would be a serious distortion to elevate *all* that lawyer's charges over the years to the current rate.

Although the most accurate means of satisfying the purpose of fee-shifting is thus the application of the correct delay factor to historical hourly rates, there has been precious little discussion in the cases of how the delay factor should be quantified and why. Just which is the right approach to that process has not been settled by the cases. Some examples bear revisiting:

1. *Ohio–Sealy*, 776 F.2d at 663 n. 17 spoke of the possibility of using "[t]he market interest rate [to] reflect[ ] both the real interest rate and anticipated inflation" (though that approach was not found appropriate under the circumstances of that case). In that respect, *Ohio–Sealy* cited to Paul Samuelson's *Economics*, which uses for purely illustrative purposes one-year Treasury notes (Samuelson at 659 Fig. 30–3 (12th ed. 1985)). But *Ohio–Sealy* itself had no occasion to discuss precisely what rate should be used.

2. *Zipes v. Trans World Airlines, Inc.*, 846 F.2d 434, 443 (7th Cir.1988) affirmed the District Court's use of the rate on a long-term Treasury note. However, the Court of Appeals engaged in no substantive discussion as to the propriety of that approach in comparison with any other.

3. *Shakman v. Democratic Organization of Cook County*, 677 F.Supp. 933, 942 (N.D.Ill.1987) used the average annual yield on three-month Treasury bills. Judge Bua's thoughtful discussion of the issues will be dealt with later in this Appendix.

4. *Skelton v. General Motors Corp.*, 661 F.Supp. 1368, 1383 (N.D.Ill.1987) rejected the request, made by two of the nine law firms involved, for historic billing rates plus interest at the prime rate (the other seven firms had requested fees at their current rates). All Judge Nordberg said on the subject was this (*id.*, footnote omitted):

> Calculation of fees pursuant to this method produces significantly higher fees than those obtained by using the firms' current rates. Following the procedure generally accepted in this Circuit, the court finds that in this case the calculation of reasonable fees on a current basis properly compensates all petitioning attorneys for the delay in payment in this case.

Lippo's expert witness in this case, economist Robert Sherwin ("Sherwin"), plumped for applying the borrowing rate of either Lippo or Mobil. Though there is academic authority for such an approach in the damage situation (Sherwin relied particularly on Patell, Weil & Wolfson, *Accumulating Damages in Litigation: The Roles of Uncertainty and Interest Rates*, 11 J.Legal Stud. 341 (1982)), neither of those alternatives fits here for the reasons discussed in the next several paragraphs.

As for the use of Lippo's borrowing rate, had the client actually been financing the litigation by paying fees right along (so that he or she would now be looking for

reimbursement from the losing party), the cost of the client's money might have been the appropriate yardstick (subject to the consideration later mentioned as to McKenna). But in this instance Lippo is only a conduit for McKenna's and Marcus' recovery of fees, even though the award is technically to be made to Lippo. In the real sense the *lawyers* have been financing the litigation by investing their time without current compensation. If anyone's cost of money is relevant, then, it is the lawyers' (of which more later).

As for Mobil, taking *its* borrowing rate into account would put *it* in the same position as if it had been financing the adversary's litigation during the course of the lawsuit. That, of course, is not the way fee-shifting works—there the obligation of a litigant to bear its adversary's fees depends on the adversary's ultimate success. But more importantly, the stress where fees are deferred should be on putting the recipient—the lawyer—rather than the unsuccessful litigant in the same situation as if there had been no deferral.

That then focuses scrutiny on McKenna. But Judge Bua's opinion in *Shakman*, 677 F.Supp. at 941 has the matter exactly right when he stresses that the individual lawyer's economic situation cannot be permitted to dictate the applicable interest rate. It should be obvious that an award of fees for a lawyer's services should be no different if the lawyer is (for example) a sole practitioner than if the identical lawyer is a member of a 100–lawyer firm, or if the lawyer is (for example) a multimillionaire than if the identical lawyer has all his or her assets tied up in a bare-bones law office and a fully mortgaged home. Mobil cannot fairly be stuck with an extra burden because (say) McKenna was not doing well financially and was therefore a poorer credit risk. There is no element of unfairness in saddling a *client* with a lawyer's market hourly rate (which presumably takes into account the lawyer's cost of capital as well as other factors)—after all, the client has chosen that lawyer. But an involuntary "client" (the opponent) cannot fairly be saddled with the economic consequences of its opponent's choice of counsel.

Accordingly this Court has consistently held (like Judge Bua) that the delay interest rate should not vary with the identity of the lawyer involved. But as already stated, there is another branch of the *Shakman* analysis (677 F.Supp. at 942) under which the delay interest rate was reduced to that on riskless government securities (short-term Treasury bills):

> Although plaintiffs assert that using the rate of return on conservative investments such as government securities does not sufficiently compensate plaintiffs' attorneys for their investment in plaintiffs' case, this argument is unpersuasive. *Delaware Valley II* teaches that delay in payment and risk of loss are distinct concepts for adjusting the lodestar and require separate analyses. As such, the riskiness of "investing" in plaintiffs' case cannot be considered when adjusting for inflation and the time value of money. *Delaware Valley II,* [——] U.S. at [——], 107 S.Ct. at 3081–82. Finally, this court doubts whether the method plaintiffs propose for compensating for delay is necessary to induce competent attorneys to accept cases covered by fee shifting statutes.

> Since this court has already determined that the adjustment for delay in payment will be made for both inflation and the time value of money, an appropriate and objective basis for calculating this adjustment is the interest rate applicable to short term Treasury bills. Such an approach is consistent with the method adopted in 28 U.S.C. § 1961 for computing interest allowable on money judgments recovered in district courts and provides a reasonably accurate measure of inflation and the time value of money.

In this Court's view, that does not give proper effect to the relevant factors or the cited portion of *Delaware Valley*. That decision, 107 S.Ct. at 3081–82 (citations omitted, emphasis added) specifically recognizes that lawyers who do not get paid as they go along are entitled to be compensated for the fact they are still engaged in the practice of law, albeit without current payment:

First is the matter of delay. When plaintiffs' entitlement to attorney's fees depends on success, their lawyers are not paid until a favorable decision finally eventuates, which may be years later, as in this case. *Meanwhile, their expenses of doing business continue and must be met.* In setting fees for prevailing counsel, the courts have regularly recognized the delay factor, either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value.... *Although delay and the risk of nonpayment are often mentioned in the same breath, adjusting for the former is a distinct issue that is not involved in this case. We do not suggest, however, that adjustments for delay are inconsistent with the typical fee-shifting statute.*

Recognition of a lawyer's cost of capital, of investing services or dollars because the lawyer is foregoing fees, is not a function of the risk of the particular case, but rather a function of the risks inherent in the choice of practicing law as such. Accordingly an interest rate that includes that element provides justice to all parties involved. This Court has therefore determined that the appropriate measure for the delay factor is the prime rate from time to time (thus equating the lawyer with the most creditworthy borrower, to avoid the unfair variability already discussed).

As already indicated, this Conclusion swims against the tide of the results stated in the few cases that have reached this point of fine-tuning fee awards.[1] But it should be stressed that those are almost without exception simply *results*, announced either ipse dixit or with the simple statement that risks should not be factored into the selection of an appropriate delay rate. For that reason, this Appendix will go on to elaborate this Court's analysis, in order that its view may be exposed to critical review (either in an appeal from this decision or, failing that, by other courts looking at this constantly recurring question).

To facilitate the discussion, hypothetical lawyer X (assumed to be a male, just to avoid the use of duplicate pronouns) may be further hypothesized as devoting full time over a number of years to a single case for which payment of fees will come at the end.[2] Of course, in the meantime X must run the law office as well as provide for himself,[3] paying for all those items that would otherwise be met out of current cash flow produced by billing at his hourly rate. If X does not have pre-existing funds that can be consumed while the case is in progress,[4] those funds must be obtained by borrowing. And at the end of the case, any restoration of X to the equivalent position as if fees had been paid to him right along, thus providing the funds for meeting all those current needs, must include the compounded cost of borrowing—and hence the use of the prime rate charged by lenders to most favored borrowers.[5]

1. Most cases have tended to opt for the use of current hourly rates instead of interest-adjusted historical rates, without explaining why and certainly without looking at whether the lawyer is really being placed in the proper "but for" situation by so doing. One reason may be that across-the-board application of current rates makes for admittedly greater ease in calculation. But there is room for suspicion that another strong incentive may be the avoidance of the conceptual difficulties sought to be confronted in this Appendix.

2. This assumption subsumes all lesser cases. It simply better isolates the need for capital that is at the core of the analysis.

3. In terms of economic analysis, it would seem no distinction should be made between providing pure subsistence and generating the ordinary income level for the lawyer himself. Hourly rates are established both to cover costs and to provide the lawyer with such income (including what might be labeled as the "profit" component).

4. Again the analysis is the same if X *does* have such funds. Cost of capital is no different if it takes the form of "eating the seed corn."

5. If anything, this represents a more favorable rate than the losing litigant is entitled to. If X is viewed as the microcosmic representative of the legal profession as a whole (to avoid the skewing of the figures by the individual lawyer's credit rating, for the reason properly perceived in *Shakman*, 677 F.Supp. at 941), the right approach would be to try to ascertain the figure showing the cost of capital (borrowing cost) for the legal "industry" as a whole. If such infor-

Now all this is without any reference whatever to the risk of *loss* in the litigation, the factor *Delaware Valley*, 107 S.Ct. at 3081–82 says must not be taken into account. Instead this discussion has assumed that payment is assured at the end of the litigation, so that the analysis reflects only the carrying costs of substituting for the unpaid funds during the interim. What *is* taken into account (and properly so) in the interest rate is the fact that capital employed in the business of lawyering is like capital employed anywhere else: It carries a cost. And in economic terms that cost is the price of borrowed, not loaned, capital. It should not fairly be equated with someone's taking assumed pre-existing capital out of assumed savings that have been lying fallow in riskless investments such as Treasury bills or Treasury notes.

So much, then, for the reason that this Court finds use of the prime rate is the appropriate measure for the cost of delayed collection. But that does not complete the analysis in all respects. As this Court has previously said in *Fleming v. County of Kane*, 686 F.Supp. 1265, 1272–1275 (N.D.Ill.1988), one factor it has never seen discussed in the cases—perhaps because acting as a senior billing partner in a law firm is not part of the universal pre-judicial background of federal judges—is the proper measure of the delay period and how that interacts with hourly rates.

No law firm, of course, bills clients for services instantaneously upon their rendition: Bills are typically rendered monthly at best, and often less frequently—quarterly or sometimes even annually. When clients are not in a position to pay fees as they go, it is not at all unusual for lawyers to defer collection by agreement—sometimes even to the end of the matter for which they have been retained.[6] Where the lawyers' regular billing practice in handling comparable matters for their paying clients involves any element of delay, that has not customarily been coupled with a charge to the client for the lost use of the dollars involved. Assuredly no basis exists for imposing such a charge to cover the interval between the rendition of the services and rendition of the bill. As for the interval between rendition of the bill and its payment, the historical view of law as a profession and not as a business actually made it unethical, at least until the 1970s, even to *agree* on the charging of interest.[7] Finally, at least while this Court was still in the practice of law (through the 1970s), bills were always rendered at the hourly rates applicable when the services were provided, not at the lawyers' current rates if those were increased in the interim.

Lippo's expert witness Sherwin did take the combination of those factors into account in his calculations. Among the assumptions he used, as described in P.Ex. 25, were these:

> Time was expended, on average, evenly throughout each year.
>
> Billing rates embody the expectation that in normal practice, with paying clients, payment will be received, on average, 45 days after the time is expended.

That last assumption may be a bit oversanguine, but not seriously enough so to call for a departure. To avoid the need for an excessive number of calculations, this Court will accept those assumptions by Sherwin, though it disagrees with him as to the delay interest rate—thus it will also assume the even spread of services throughout each calendar year, will view

---

mation were available, the industry's average borrowing cost—which would surely be greater than the prime rate—ought to be used. This certainly illustrates that the use of short-term riskless government securities—the risk-free lending rate rather than the borrowing rate—gives the losing litigant an even greater windfall than the use of the prime rate.

**6.** This is entirely apart from the different situation of a purely contingent fee, in which any payment at all is conditional upon success and the fee is almost always based on a percentage of the recovery. It is well established that contingent fee arrangements do not control awards where (as under Section 1988) the prevailing plaintiff has a statutory right to fees (see, e.g., *Hagge v. Bauer*, 827 F.2d 101, 110–12 (7th Cir. 1987)).

**7.** Thus no bills in the legal profession (or even the law "business") were then permitted to read (say) "Net 30 days—1% per month thereafter." That has now changed.

interest for each year's services as accruing from August 15 of that year (some 45 days after the year's mid-point) and will treat the interest rate applicable from that date as the weighted prime rate during that year.