**In re TELESPHERE INTERNATIONAL SECURITIES LITIGATION.**

No. 89 C 1875.

United States District Court,
N.D. Illinois, E.D.

Nov. 28, 1990.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

On October 23, 1990 this Court approved the settlement in this securities class action as fair, reasonable and adequate. But because it had not then been provided with all the necessary information as to the one issue on which the class was not independently represented—the amount of attorneys' fees to be charged against the settlement fund, a question as to which class counsel and class members by definition have conflicting interests—this Court requested and has now received additional input from class counsel bearing on that subject.

That added information is sufficient to permit the exercise of an informed judgment as to a reasonable fee award. In that respect this memorandum opinion and order will first look at the "lodestar" approach to that question, then (as counsel have suggested) will turn to the percentage-of-recovery approach in the process of evaluating whether or not that approach, or perhaps a multiplier times the so-called "lodestar," should apply to compensate for counsel's risk-taking.[1]

## "LODESTAR"

Some factors that enter into the "lodestar" calculation as it has been tendered by counsel require a fresh (or more accurately an objective) look. They will be dealt with at the outset, after which an adjusted "lodestar" figure will be developed based on those factors.

1. Hours

■ As for the hours actually spent by counsel, the lawyers themselves recognize the existence of some wastage in that respect. First of all, this litigation began with a multiplicity of lawsuits—the familiar (if not invariable) result when a public company, with stockholders located all around the country, suffers an event that sets the antennae of plaintiff class action securities lawyers vibrating.[2] That multiplicity alone meant that a substantial number of lawyers had engaged in much the same threshold activity, very likely of significant scope, in order to prepare and file their complaints. And of course that initial activity was necessarily duplicative and ultimately provided no more benefit to the class than a single law firm's efforts would have done.

At the next stage the various suits ended up grouped on this Court's calendar via transfer and consolidation. And even though this Court then insisted on dismissal of all the individual suits in favor of a single consolidated complaint, the problems of selecting lead counsel and thereafter of monitoring the efforts of the several law firm participants had to be dealt with by the lawyers—once again with some inevitable duplication of effort even on the most favorable assumptions.

To put the matter most simply, there is just no question that the hours spent by *ten* law firms, as evidenced by plaintiffs' counsel's submissions, had to exceed by some substantial amount the time that lawyers in one law firm handling the ultimate single lawsuit would have had to spend in its preparation, filing and prosecution. And that is so no matter how efficiently the lead counsel and liaison counsel were in their efforts at coordination and in parceling out the work once the litigation team was organized.

---

1. This opinion will not essay any such extended treatment of the subject as that recently generated by its colleague Honorable Hubert Will, *In re Superior Beverage/Glass Container Consolidated Pretrial,* 133 F.R.D. 119 (N.D.Ill.1990). Instead it will assume familiarity with all the relevant case law on fee awards and will set out most of the views expressed here in conclusory form. In material part this Court shares the opinions that Judge Will has set out at greater length in *Superior Beverage.* But in other respects, based on both components of its own experience—first during three decades as a billing partner (including a number of years as the senior billing partner) in a law firm handling cases in this area, as well as other aspects of a sophisticated legal practice, then during this past decade on the bench—this Court's views differ from those that Judge Will has articulated so well.

2. This should not be perceived as a critical comment of the type that, in some quarters, has led almost every derivative or class action charging corporate misconduct to be labeled as a "strike suit." This Court has always considered the stockholder class action as an essential device serving a useful social function, for it is rare that any individual stockholder has enough at stake to support litigation against even the most egregious misconduct by corporate management.

Nevertheless this Court has not sought to carve any time out of the total hours to reflect that indisputable factor.[3] Instead the just-described point has been made in this opinion to recognize that any so-called lodestar figure that accepts the lawyers' hours at face value *already* contains a multiplier of some material but unquantified amount. After all, from the point of view of the clients—the stockholder class—no added value is contributed by a multiplicity of actions. In terms of the real value of legal services, the logical measure of a reasonable fee would be the amount that would have been earned by a single law firm handling the matter for the plaintiff class from the inception of the case.

## 2. *Hourly Rates*

As for the other component of the conventional lodestar calculation—hourly rates—more than one factor calls for discussion. They too will be addressed before this opinion applies the principles outlined here to the factual submissions.

First, as to the delay factor,[4] this Court has on several occasions explained why historical hourly rates with an adjustment for interest provide a substantially more precise level of compensation for the phenomenon of delay in payment than the simplistic (though convenient) application of today's hourly rates to all time spent by counsel during the course of the litigation (see, e.g., *Brandt v. Schal Associates, Inc.*, 131 F.R.D. 512, 520–22 (N.D.Ill.1990), *Lippo v. Mobil Oil Corp.*, 692 F.Supp. 826, 838–42 (N.D.Ill.1988) and *Fleming v. Kane County*, 686 F.Supp. 1264, 1272–74 (N.D.Ill. 1988)). In this instance the supplemental submission made by plaintiffs' counsel in response to this Court's request provides a number of confirmations of that proposition. Only a few of those confirmations bear brief mention, as drawn for example from the largest single request received from the participating law firms:

1. For one thing, fully 25% of the total fees of *all* the lawyers as requested in this case, when viewed in terms of the lodestar at current rates ($86,800 out of $348,890.50), represent the time of a single lawyer, Stephen Ramos, Esq. ("Ramos"), who moved from associate to partnership status in his firm on January 1, 1990. That type of advancement was specifically and accurately portrayed by *Fleming*, 686 F.Supp. at 1273 as a classic example of why current hourly rates across the board do *not* properly reflect compensation for the delay factor alone.

2. During the space of two and one-half years (the relevant time period in this litigation), the hourly rates of that firm's partners senior to Ramos have escalated from $350 to $450 (more than a 28% increase), $225 to $310 (about 38%), $275 to $345 (over 25%), $250 to $345 (38%) and $215 to $285 (nearly 33%).

It is unnecessary to prolong the analysis—clearly the more than 16% difference between that firm's charges at historical rates ($92,397) and its proposed recovery at current rates ($107,458.50) is *not* just a reflection of delay in collection. It is equally not a fair surrogate for what should be

---

**3.** One principle reason for not undertaking that task is its inherent difficulty—the familiar problem of trying to reconstruct matters in hindsight and looking from the outside in.

**4.** At the outset a brief look is in order as to the propriety of making *any* adjustment for delay in the payment of fees. Any lawyer who undertakes a matter on a contingent basis always takes on two related risks implicit in such representation: (1) the risk of total nonpayment if the litigation is unsuccessful ("success" for that purpose being obtainable either through litigation on the merits or via settlement) and (2) the certainty that any fees to be derived if the litigation *is* successful will be obtained only at its conclusion (hence representing a built-in delay). In the context of statutory causes of action providing for fee-shifting, the definitive principles taught by *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) are that (1) any award of an enhancement factor attributable to the risk of failure is improper while (2) "[w]e do not suggest ... that adjustments for delay are inconsistent with the typical fee-shifting statute" (*id.* at 716, 107 S.Ct. at 3081–82). Our Court of Appeals in *Skelton v. General Motors Corp.*, 860 F.2d 250 (7th Cir.1988) has reconciled those principles as stated in the fee-shifting context with those applicable to common fund cases (most often class actions) such as this one in this way: In the common-fund situation *Skelton* announced the court's approval of both (1) the potential award to the lawyer of a risk multiplier (*id.* at 252–57), or maybe even a percentage of the class' recovery (*id.* at 255 n. 4), in each instance in recognition of the risk of loss of any award at all to the class and (2) the award to the lawyers of a delay factor if a lodestar approach is taken to the basic fee award (*id.* at 255 n. 5). Though the propriety of the latter component was really assumed rather than established as an analytical matter in *Skelton*, this Court is of course bound to follow that decision.

determined to be a reasonable fee in the terms that this Court has analyzed at length in *Fleming* and *Lippo* and in briefer compass in *Brandt.*

■ Second, the hourly charges for many of the lawyers (some of them in the firm just referred to, and a number of them in other firms) are at levels much higher than are necessary to provide quality representation to the class. When clients choose their own lawyers, the free market operates—whether or not the bargain is made on the basis of truly full information,[5] it reflects an agreement between a willing buyer and willing seller of legal services. But in the stockholders' class action it is the lawyers who choose themselves for all practical purposes [6]—true enough, there is a one-to-one relationship between the lawyer and the individual class representative, but that relationship cannot equate to a bargained-for retainer by the entire class.

Hence the court must stand in the position of an intermediary acting for the class members in establishing rates. In this instance a large number of the lawyers seek to charge in the $300 to $400 hourly range, with several upwards of $400. But this is not a situation in which expert practitioners from other jurisdictions, where the prevalent market rates are higher than those in Chicago, must be brought in to fill a vacuum here. Chicago is scarcely a benighted backwater with little or no experience in dealing with sophisticated securities litigation. And the information derived from all three Chicago firms that had major involvements in this litigation is strikingly parallel:

1. Defense counsel representing Telesphere, a long-established and well-recognized firm of more than 100 lawyers, report that their current hourly rates range downward from a maximum of $245. That top figure is charged by a partner (tenth in seniority within the firm) who reports 20 years in the practice of law, and who is known to this Court as a skilled litigator.

2. Plaintiffs' liaison counsel firm (selected to perform that function by all the plaintiffs' lawyers in the case) charges $240 per hour for services rendered by the senior partner, who is also an experienced securities law class action litigator and who also has 20 years of practice under his belt. This Court has seen the quality of that lawyer's work in other litigation, and it is first-rate. And although this Court is not familiar with the caliber of performance by the other partner who rendered the bulk of the services by the firm, that partner's credentials are also impeccable and certainly appear to support the requested $180 hourly rate.

3. Another Chicago firm representing the class—a small firm primarily engaged in stockholder class and derivative actions as well as in general business litigation—reflects an hourly rate of $250 for its most senior people, (whose experience runs in the 10–15 year range). Again the credentials of those lawyers are impressive. Although their rates might be thought of as comparatively high if this Court were to attempt any degree of fine tuning (in order to create lateral justice among the many lawyers involved here), their rates are not *so* far out of line—and they too confirm the sense of relevant numbers derived from the rates charged by the other two Chicago firms.

■ All in all, this Court is not prepared to approve more than a *current* rate of $250 per hour (thereby including the delay factor) for *any* of the members of the cast of characters representing the plaintiff class here. That conclusion is firmly undergirded by our Court of Appeals' discussion in *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 768–69 (7th Cir.1982). As the Court of Appeals summarized its analysis (*id.* at 769):

the best in town—and we know that the clients can't *all* be right in making that judgment.

5. All lawyers know that the client is rarely if ever equipped to make a fully informed judgment in selecting counsel. Legal services (and lawyers themselves) are not fungible, and the choice of counsel always implicates a host of intangible factors—almost never a bidding in terms of price (but see n. 10). Indeed, in terms of the subjective factors that enter into the choice of counsel, most clients go to their lawyers because the client believes the lawyers are

6. One need not be a total cynic, or subscribe entirely to the scenario portrayed as to the origin of a class action in Shelby Yastrow's current novel *Undue Influence,* to understand that such lawsuits in the securities field most often either begin with the lawyer or, if not, derive their main impetus from the lawyer.

We think that a judge, in allowing an attorney's fee under Title VII or similar statute,[7] has discretion to question the reasonableness of an out of town attorney's billing rate if there is reason to believe that services of equal quality were readily available at a lower charge or rate in the area where the services were to be rendered. In this case there is substantially more than such a "reason to believe" that supports this Court's "question[ing] the reasonableness of the rates at issue." Accordingly all requests for hourly rates higher than $250 will be cut back to that figure.[8] However, no effort will be made to scale back each of the requested rates that begin below that figure, in order to cause them to provide total comparability in terms of the lawyers' relative degrees of experience and other relevant factors.

■ Third and last in terms of the allowable rates for lodestar purposes, this Court is of course aware of the teaching of *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 109 S.Ct. 2463, 2469–72, 105 L.Ed.2d 229 (1989) that paralegal time is compensable at market rates in the 42 U.S.C. § 1988 context. It is also familiar with Judge Will's approval of paralegal rates as though they were a separate "profit center" (*Superior Beverage*, 133 F.R.D. at 131). But this Court's just-expressed approval of the $250 hourly rate as the highest rate reasonable for the lawyers themselves has been given in contemplation of treating all operating expenses of the law firms except lawyers' salaries, drawings and partnership profits—that is, every other expenditure that enters into running a law firm, including payments of compensation to paralegals among all the other nonlawyer personnel—as overhead in determining a fair rate for the lawyers' time. With that premise having entered into this Court's determination of the ceiling rate for lawyers, it would amount to double billing if paralegals were also to be treated as the equivalent of lawyers in terms of profit centers, carrying their own full aliquot share of general overhead.[9]

For that reason this Court requested input from counsel as to the *real* cost to them of the services of their paralegals (including fringe benefits as well as direct labor to the law firms), to provide a basis for evaluating a reasonable allowance for paralegal time. That request has been honored, and this Court has concluded that the appropriate measure is to apply an across-the-board $40 hourly rate to all paralegal time.[10]

### 3. *Calculation*

Application of the just-described principles leads to results that will be summa-

7. [Footnote by this Court] Needless to say, there is nothing in the common-fund situation that calls for a different rule. It is simply that *Chrapliwy* happened to be dealing with the kind of situation referred to in the quotation.

8. Perhaps the most striking instance of excessiveness in the current requests is that of New York City attorney Harvey Greenfield, Esq. ("Greenfield"), who seeks the payment of $20,825 for 49 hours of his time (a current $425 hourly rate). However impressive his credentials and experience may be (and they are), Greenfield reflects that the bulk of his time (over half) was spent in the pre-complaint and complaint stage of the individual lawsuit that he brought and that was later transferred here. More than one-third of his time was categorized as "discovery," obviously also primarily representing very early-stage activities. Even were this Court prepared to approve the $425 rate under any circumstances (and it is not), it would certainly not do so here. For one thing, there is generally no reason to approve the use of the heavy legal artillery at such extremely high rates for the described types of activities at the threshold of the litigation. For another, there is not the slightest question but that all or virtually all of the hours involved come under the category of duplicative activity already mentioned in the text. It is more than enough for this Court to allow any recovery for the time at all (in terms of reasonableness of the total time, and therefore of total fees chargeable against the class), let alone to include that time at the requested boxcar rate.

9. This approach is entirely consistent with Justice Brennan's discussion for the Supreme Court in *Jenkins by Agyei*, 109 S.Ct. at 2470–71.

10. *Jenkins by Agyei*, 109 S.Ct. at 2471–72 upheld a $40 rate (there having been a showing that the party opposing any compensation for paralegals had itself approved a $35 hourly rate for paralegals employed by its own outside counsel). And though plaintiffs' counsel's most recent submission has referred this Court to its own approval of paralegals' compensation in *Brandt v. Schal*, 131 F.R.D. 485 at 511, (N.D.Ill.1990) it should be noted that the hourly rate approved there was $35. Finally, this Court's colleague Honorable John Grady has recently approved hourly paralegal rates ranging between $13 and $44 (mostly at levels below $30) based on their levels of actual compensation, explaining at some length his holding that the requested hourly rates of $50 to $75 for such work were not reasonable (*In re Continental Illinois Securities Litigation*, 750 F.Supp. 868, at 889–893 (N.D.Ill.1990)).

rized in narrative form, and then repeated in Appendix A in tabular form. Here is the brief narrative summary: [11]

*Berger & Montague, P.C.*—All lawyers except Ramos and Holter (their time aggregating 43.5 hours) will be included at $250. Ramos' 347.2 hours are approved at $225 each. Holter's 23.6 hours are approved at $125 per hour. Those charges, together with 34.1 hours of paralegal time at $40 per hour, add up to $93,509.

*Wolf Popper Ross Wolf & Jones*—Both Oestreich and Finkel (whose combined time aggregates 321 hours) are approved at $250 per hour. When that is added to 3.4 hours of paralegal time at $40 per hour, the total becomes $80,386.

*Chertow & Miller*—As already stated, both hourly rates are approved as submitted, for a total charge of $21,502.

*Kohn Savett Klein & Graf, P.C.*—Savett's 23.8 hours are approved at a $250 rate. Podell's 19.5 hours are approved at a $230 rate. Ryan's 28.5 hours are approved at a $160 rate. When those charges are added to 2.1 hours of paralegal time at the $40 rate, the total becomes $15,079.

*Stull Stull & Brody*—Both Brody and Levine (aggregating 49.5 hours) are approved at a $250 rate, for a total of $12,375.

*Silverman Harnes & Obstfeld*—Silverman's 138.75 hours are approved at the $250 rate, for total charges of $34,687.50.

*Schiffrin & Craig, Ltd.*—This is the other Chicago firm, referred to earlier in the text, whose hourly rates have been found reasonable. Their total fees aggregate $22,291.25 and are approved in that amount.

*Law Offices of Robert D. Allison*—Allison's 18.1 hours are approved at a $210 figure, for a total of $3,801.

*Lawrence Walner & Associates, Ltd.*—Walner's 24.5 hours are approved at a $250 rate. When that is added to 4.8 hours of paralegal time at the $40 rate, the total becomes $6,317.

*Harvey Greenfield, Esq.*—As already stated, Greenfield's 49 hours are approved at a $250 figure, which comes to $12,250.

In the aggregate, those amounts come to $302,197.75. And as indicated at the beginning of this section, Appendix A sets out the individual firm figures and the total in tabular form.

## PERCENTAGE OF RECOVERY

■ There is something to be said for awarding fees as a percentage of recovery rather than in lodestar terms, and plaintiffs' counsel's Mem. 11–14 has said it well (see also *Skelton*, 860 F.2d at 255 n. 4).[12] In lieu of the amounts set out in their lodestar requests, plaintiffs' ten sets of lawyers ask for 25% of the $1,519,500 fund or $379,875, characterizing that as equivalent to a very modest multiplier (about 109%) of their claimed lodestar of $348,890.50 (the latter figure, as indicated earlier, representing the lodestar at current hourly rates).

In fact that comparison is misleading, for the properly calculated (or more accurately, the already overstated) lodestar outlined in the preceding section works out to a considerably lower ratio: almost exactly 20% of the class recovery (to be more precise, just

---

**11.** All lawyers are referred to simply by their last names.

**12.** Indeed, District Judge Vaughn Walker of the Northern District of California has not only espoused the percentage-of-recovery approach in a case that also involved multiple class actions and a corresponding number of law firms seeking to represent the class (a situation entirely comparable to the posture of this case at its inception), but has actually made his designation of class counsel by taking competitive bids from the interested law firms and then awarding the representation to the firm that tendered the most favorable bid (that is, the one that appeared most likely to charge the lowest fee to the class when all the variables were taken into account). See the extraordinarily interesting discussions by Judge Walker of the reasons that he opted for the competitive bidding process (*In re Oracle Securities Litigation*, 131 F.R.D. 688 (N.D.Cal.1990)) and of the results of that process (132 F.R.D. 538 (N.D.Cal.)). In the best tradition of imitation as the sincerest form of flattery, if a like situation were to present itself to this Court on another occasion, it would give serious consideration indeed to following Judge Walker's lead at the very beginning of the litigation, obviating any need to engage in the kind of analysis indulged in this opinion.

under that figure). And that in turn would mean that the requested amount would come to more than a 125% multiplier.

This Court sees no justification for such a result here. Even if the approach to awarding fees in common-fund cases were to shift to a percentage of recovery rather than to an adjusted lodestar, it would seem clear that the percentages approved ought to be selected in a way that would reflect all the variables among cases—variables such as the perception of likelihood of success at the outset of the action, when the risk is actually undertaken by the lawyers.[13] By definition that would call for differing percentages in different cases. There is certainly nothing sacred about a 25% figure. More importantly, it surely does not reflect a *floor* for the percentage-of-recovery calculation,[14] and this case is one in which a much more modest percentage such as 20% appears far more appropriate.

In summary, the percentage-of-recovery approach is not a precision instrument even if it were to be adopted—cases that apply it on a post-hoc basis are all over the lot in setting the percentage, and the possibility of an up-front establishment of the percentage is no longer available in this case. And in view of the lower-than-usual perceived risk that existed at the outset of this litigation, and in view of the extent of lawyering that produced the ultimate result, plaintiffs' counsel would fare no better under that approach (and the plaintiff class would fare no worse) than via the adjusted lodestar.

## MULTIPLIER

That leaves for consideration only whether a multiplier should be applied to the previously calculated lodestar figure and, if so, how much. As already pointed out more than once, the lower lodestar figure that has been derived by this Court—even though adjusted downward from counsel's requests—still inherently contains some built-in multiplier of an unascertainable amount.[15] It might well be that the dollars should be left as they have been developed earlier in this opinion in light of that fact and in light of the additional fact that, as these cases go, this one had to be objectively perceived as comparatively low-risk at the outset.

But this Court has concluded that such a result might represent an insufficient reward for the good work done by the lawyers. What will be done instead is to apply the lawyers' requested 109% multiplier (though to be sure it was requested as to a quite different base figure) to the adjusted lodestar of $302,197.75, for a total award of

---

13. As this Court commented orally in the course of its ruling on the settlement arrived at among the parties, when the case first began it must have looked to the numerous sets of competing class counsel to be an extremely attractive one—nearly a sure winner. And of course the lawyers' *later* ascertainment of facts that cast substantial doubts on that evaluation should not be used to alter the percentage rate that would be chosen to reflect the perceived risk at the outset. After all, the establishment of a contingent fee in a private retainer case (say one seeking the imposition of liability and damages for personal injury or wrongful death) takes place at the beginning, based on the lawyer's then-existing appraisal of the case.

14. In *Oracle Securities* the structures of the competitive bids (only four were involved) were as varied as the lawyers' imaginations could conjure up. One firm that exhibited the least creativity in terms of providing for contingencies (such as sliding scale rates dependent on the amount recovered or on the stage of the litigation at which the recovery was obtained) bid a flat contingent fee of 24% (*including* the absorption within that 24% figure of all out-of-pocket expenses as well as attorneys' fees), later modified to a bid of 22½% for the attorneys' fees alone. Because that firm was not the successful bidder, Judge Walker obviously evaluated the winning bid (including its several variables, such as a guaranteed ceiling on the litigation expenses that was well below the estimates of the other bidders, all of which were open-ended in that respect) as being *more* favorable to the class than the straight 22½%-of-recovery alternative offered by the unsuccessful bidder.

15. Once again it may be repeated that a substantial cushion has already been built into the fee award by this Court's full acceptance of time that is concededly duplicative (although for just that reason, any attempt to quantify that duplication would be extraordinarily difficult and hardly worth the effort).

$329,395.[16]

## CONCLUSION

This Court approves the payment to counsel of a total fee of $329,395, plus the verified out-of-pocket expenses of $34,436.97. Although fairness to all the lawyers concerned would strongly suggest that the fee award should be divided in the proportions represented by the adjusted amounts as set out in Appendix A, counsel are of course free to agree among themselves to a different distribution. This Court will await a motion from liaison counsel or lead counsel to indicate the manner in which the total funds should be disbursed to counsel and the class members.

## APPENDIX A

| Firm Name | Amount |
| --- | --- |
| Berger & Montague, P.C. | $ 93,509 |
| Wolf Popper Ross Wolf & Jones | 80,386 |
| Chertow & Miller | 21,502 |
| Kohn Savett Klein & Graf, P.C. | 15,079 |
| Stull Stull & Brody | 12,375 |
| Silverman Harnes & Obstfeld | 34,687.50 |
| Schiffrin & Craig, Ltd. | 22,291.25 |
| Law Offices of Robert D. Allison | 3,801 |
| Lawrence Walner & Associates, Ltd. | 6,317 |
| Harvey Greenfield, Esq. | 12,250 |
| | $302,197.75 |

16. Although what follows in this footnote was not the reason for (let alone the method of arriving at) the figure just given in the text, it may be observed that the fee award turns out to be 21.68% of the class settlement figure—well within the range of past awards that have adopted the percentage-of-recovery approach.