**Sherry EIRHART, Plaintiff,**

v.

**LIBBEY–OWENS–FORD COMPANY, Defendant.**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**LIBBEY–OWENS–FORD COMPANY, Defendant.**

**Nos. 76 C 3182, 78 C 2042.**

United States District Court, N.D. Illinois, E.D.

Aug. 19, 1991.

First Supplement to Memorandum Opinion and Order Aug. 23, 1991.

Second Supplement to Memorandum Opinion and Order Aug. 29, 1991.

Thomas R. Meites, Lynn Sara Frackman, Michael M. Mulder, Bonnie L. Beck–Fries, Meites, Frackman, Mulder & Burger, Chicago, Ill., for Eirhart.

Margaret Lee Herbert, Chicago, Ill., for E.E.O.C.

Robert S. Soderstrom, Tressler, Soderstrom, Maloney & Priess, Chicago, Ill., for Libbey–Owens–Ford Co.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This Court's May 22, 1991 memorandum opinion and order as supplemented June 7 (collectively "Opinion 1"), coupled with its June 12 "Opinion 2," found that plaintiffs were entitled to an award of attorneys' fees for part (though not all) of the matters covered in their November 7, 1990 petition for fees (the "Fee Petition"). Both plaintiffs and Libbey–Owens–Ford Company ("LOF") have submitted memoranda on the remaining questions relevant to quantifying the fee award.

In a number of areas the parties have no quarrel: the basic hourly rates to be ascribed to plaintiffs' lawyers in calculating the "lodestar" figure and the reasonableness of the hours spent on Fee Petition categories A, G, H and K—four of the five categories that this Court found compensable in Opinion 1. What remain open are these issues that are now ripe for decision:

1. what portion of the Petition F [1] hours are compensable;

2. what calculations are appropriate to adjust for delay in payment; and

3. whether a multiplier should be applied to the lodestar figure and, if so, how much.

### Compensable Hours

Petition F covers plaintiffs' lawyers' services that are compensable in some areas as well as services in other areas that are not. One of plaintiffs' lawyers (Lynn Sara Frackman) has submitted an affidavit stating that just 10% of the 35 hours spent on Petition F matters (more than one-half of those total Petition F hours were put in by Ms. Frackman) actually related to the noncompensable matters. LOF counters by

---

1. That was the usage followed in describing the components of the Fee Petition in Opinion 1, and it will be employed here as well.

arguing that just two of the four subcategories in Petition F were compensable, so that LOF calls for a 50% reduction in the requested time.

It would be overly simplistic to adopt LOF's suggested approach. As with *Animal Farm*, some of the issues subsumed within Petition F were far more equal than others. Certainly the most time-consuming of them had to be the sharp dispute—presenting a serious and complex legal question that this Court was required to resolve—over LOF's reporting of the payment of class counsel's attorneys' fees as income to the class members. Because both sides recognize that the two noncompensable issues were joint efforts of the parties (LOF Mem. 3, P.R.Mem. 3) and therefore necessarily involved much less time, clearly only a minor fraction of the Petition F time should be disallowed.

It might perhaps be arguable that 10% is a bit too modest a discount, but this Court has no real way to go behind the records to make an assuredly accurate hindsight calculation. With just 35 hours having been spent on all of the Petition F matters, the numbers suggested by plaintiffs' counsel Frackman could arguably be off by only a few hours at most. This Court accepts the sworn estimate of Ms. Frackman—the lawyer who did most of the work—as a knowledgeable and credible characterization.

### Delay in Payment

This Court has had many occasions to deal with the subject of attorneys' fee awards—as a frequent lecturer or seminar participant, as well as in numerous oral rulings and written opinions. On the more focused question of how it is most appropriate to compensate for delay in payment, the availability of three of its written opinions (*Fleming v. County of Kane*, 686 F.Supp. 1264, 1272–75 (N.D.Ill.1988); *Lippo v. Mobil Oil Corp.*, 692 F.Supp. 826, 838–42 (N.D.Ill.1988); *In re Telesphere International Securities Litigation*, 753 F.Supp. 716, 718 (N.D.Ill.1990)) obviates the need for a great deal of discussion here.

As those opinions make plain, the goal of the fee award should be to place the lawyer in the same economic position as if the matter had been billed and paid like any regular component of the lawyer's practice for a paying client, rather than having to wait for payment at the end of the litigation (*Fleming*, 686 F.Supp. at 1272). That goal is best attained in this manner:

1. Historical hourly rates should be used rather than employing today's billing rates—really an arbitrary (though simple) method that unfortunately sometimes provides a windfall for the payor and sometimes provides a windfall for the payee. It is sheer accident when the changes in billing rates from the time the services were rendered to the time they are paid for mirror the true economic cost of the delayed payment (*Lippo*, 692 F.Supp. at 838–39).

2. For the reasons also explained in *Lippo, id.* at 839–42, the interest rates used to equate (a) payment today with (b) past payment plus the use of the money since then should be the prime rate from time to time.[2]

3. To equate the deferred-payment calculation to the paradigm of timely billing and payment, the calculation should assume that each monthly payment would have been 30 days after the end of month in which services were rendered (*Fleming*, 686 F.Supp. at 1274). To minimize the number of individual calculations that would have to be made on a month-by-month basis, a weighted-average methodology (*id.* at 1274 n. 17) ordinarily produces results so close to the model as to serve the purpose satisfactorily.

Plaintiffs had initially sought a combination of current billing rates *plus* prejudg-

---

**2.** Interestingly enough, since this Court decided *Lippo*, our Court of Appeals has announced that awards of prejudgment interest should be the norm in all federal-question damage cases (*Gorenstein Enterprises, Inc. v. Quality Care–USA,* *Inc.,* 874 F.2d 431, 436 (7th Cir.1989)). And the proper interest rate in that respect has been stated as the prime rate—indeed, as calling for a *compound* interest calculation at the prime rate (*id.* at 436–37).

ment interest (P.Mem. 2). LOF had responded quite correctly that any such treatment was wrong—so LOF instead contended (properly) for the use of historic hourly rates rather than current rates, but its position was that interest on the charges determined with the use of those rates should then be calculated at the prime rate only from the Fee Petition date. Each of those approaches—that proffered by plaintiff and LOF's response—thus unduly favors the filing party (something that is never a surprise), but P.R.Mem. 3–5 and its Attachment 3 properly adheres to the principles that this Court has announced in the cited cases. Because this opinion has already ruled in plaintiffs' favor on the first issue dealt with earlier in this opinion, this Court therefore also approves the "lodestar" calculation of $30,975.87 as of August 15, 1991.[3]

## Multiplier

■ Plaintiffs urge that a multiplier be applied to that lodestar figure because of the risks that were and are implicit in their representation. LOF responds with three objections. It says a multiplier is contrary to:

1. the agreements between the parties (LOF Mem. 6–7);

2. this Court's rulings (LOF Mem. 7–8); and

3. the relevant case law (LOF Mem. 9–10).

Although LOF's position is certainly arguable on the last of those three points (but clearly not on the first two), it ultimately loses on all counts.

First, all that the parties' Settlement Agreement Art. VII, § 3 says is this:

Defendants shall pay such reasonable attorneys' fees to Plaintiff Eirhart as the Court shall direct or as they shall agree, subject to Court approval. Nothing herein shall affect any party's right to seek attorneys' fees in connection with any action seeking enforcement of or

compliance with this Agreement or the Decree.

Nothing there says a word as to the *measure* of such fees if awardable. Instead, as Opinion 2 at 3 (emphasis in original) says:

By its terms SA Art. VII § 3 both (1) conferred a *right* on Class Counsel to recover certain fees and (2) confirmed that such rights did not negate the potential for another award of fees *under law.*

Second and relatedly, the LOF Mem. 7 reference to Opinion 1 as a basis for rejecting a multiplier is equally misconceived. Nothing there speaks to the *amount* of attorneys' fees either, as distinct from the scope of potentially compensable services.

That then leaves the multiplier issue to be resolved in accordance with the case law on the subject. On that score, as already indicated, LOF certainly cannot be faulted for arguing against the award of a lodestar enhancement—considerable case law (including the older case law in this Circuit) supports that position, and the question of a risk-reflective multiplier has created the sharpest conceivable split in the Supreme Court in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*"Delaware Valley II"*): actually a 4 to 4 to 1 division, even more splintered than the far more frequently encountered 5 to 4 margin of decision.

But plaintiffs' counsel are correct in pointing out (R.Mem. 9–10) that our own Court of Appeals has more recently rethought the problem and has expressed a different view from its earlier opinions (those relied on by LOF) in *Skelton v. General Motors Corp.,* 860 F.2d 250 (7th Cir.1988). There the court said (*id.* at 257 & n. 9):

The district court recognized that this circuit has in recent years disfavored awarding fee enhancers in statutory fee cases.[9] As we noted above, however, the Supreme Court has since squarely addressed this issue. In *Delaware Valley,* a group of citizens had prevailed in

---

**3.** Inasmuch as payment will necessarily be made at a date later than that (this opinion is being issued August 19), that figure will be increased by calculating interest from August 15 to the payment date at the most recent prime rate (8.5% per annum).

an action under the Clean Air Act, 42 U.S.C. § 7410. Fees were awarded to the plaintiffs (not directly to their attorneys) under the fee-shifting provision of the Act, *id.* § 7604(d). The defendant appealed the district court's enhancement of the fee award to compensate the plaintiffs' attorneys for assuming the risk of loss through nonpayment. Justice O'Connor, casting the deciding vote, agreed with the plurality that the circumstances of *Delaware Valley* did not warrant the award of a risk multiplier. She agreed with the dissent, however, "that Congress did not intend to foreclose consideration of contingency in setting a reasonable fee under fee-shifting provisions." 107 S.Ct. at 3089 (O'Connor, J., concurring in part and concurring in judgment).

In light of the *Delaware Valley* decision, we cannot adopt the position that risk multipliers are prohibited in all statutory fee-shifting cases.

\* \* \* \* \* \*

Having concluded that plaintiffs' counsel are not precluded from seeking a fee enhancer to compensate for contingency we turn to the question whether under the circumstances of this case they are entitled to the risk multiplier they seek.

[9] To the extent that this circuit has previously taken a position disfavoring risk multipliers in fee-shifting cases, *see, e.g., McKinnon [v. City of Berwyn],* 750 F.2d [1383] at 1392 [(7th Cir. 1984)], we appear to be withdrawing from that position. *See Kirchoff v. Flynn,* 786 F.2d 320, 326 (7th Cir.1986) ("Increasing hourly rates for risk and delay is one way of restoring the hourly rate a lawyer could obtain from a paying client, and a necessary way when the base of the fees must be the hourly rate."); *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 776 F.2d 646, 661 (7th Cir.1985) ("We do not mean to imply that a multiplier for the contingent nature of success is inappropriate when lawyers bear the risk of nonpayment and the delay in payment."). *But see Hagge [v. Bauer],* 827 F.2d [101] at 111 [(7th Cir.1987)] (risk of loss is not a basis in this circuit for enhancing lodestar; Supreme Court has yet to decide this issue).[4]

**4.** [Footnote by this Court] In retrospect, this Court's footnote in *Telesphere,* 753 F.Supp. at 718 n. 4 unduly cabined both *Delaware Valley* and *Skelton* by paying insufficient heed to the

*Skelton* went on to "remand this case to the district court to consider whether class counsel are entitled to compensation for incurring the risk of nonpayment" (*id.* at 258). It discussed in some detail the justifications for the risk-based multiplier, referring in part to a Yale Law Journal article's suggestion that "lawyers in successful cases receive a fee twice what they would have received from clients whose payment is not contingent on success." It then emphasized the discretion vested in the district court, "familiar as it is with the nature of the litigation, ... to decide if and to what extent the plaintiffs' counsel should be compensated for risk," and concluded the discussion with this thought (but not decision) (*id.* at 258):

It may be that a doubling of the lodestar would provide a sensible ceiling. It would certainly address the concern that extremely risky cases (those bordering on the frivolous) not warrant extremely large risk multipliers.

This case seems the model candidate for application of a multiplier—and a substantial one. Class counsel here are not in the same position as a lawyer who decides whether or not to accept a case in the first instance—and who can at that time make a market decision about the case's strengths and weaknesses (the risk of loss) and about whether accepting the case on a contingency is worth that risk. Instead the class counsel in this instance have ongoing responsibilities to the class whom they have represented so well over a period of many years—rendering services that culminated in the Settlement Agreement and Consent Decree. As and when post-Decree issues arise now, counsel's obligations to their class-member clients may well include the *duty* to assert many arguments that can be advanced in objective good faith on behalf of their clients (that is, arguments that do not involve risks of sanctionability under Rule 11) but that ultimately prove to be losers. In that respect class counsel are much like in-house counsel or regular cor-

language in Justice O'Connor's swing vote (including her language quoted in the foregoing excerpt from the *Skelton* opinion).

porate counsel—captive in the sense of being bound to represent the client[5]—but they do not have the same assurance as those types of lawyers of receiving regular payment for all their services regardless of the outcome.

Where as here a lawyer has affirmative responsibilities to handle matters that can be compensated for only if he or she wins, it is an intolerable system that would pay for the ultimately successful components of the ongoing representation only at the straight hourly rates that apply to the lawyer's representation of clients with advance assurances of payment. That would put the lawyer in the no-win situation in which the only possibility of adequate compensation would be the attainment of a 100% success rate—an extraordinarily unlikely (if not downright impossible) prospect for even the most skillful advocate. This Court will instead follow the lead of the *Skelton* remand—and it accordingly finds that the requested doubling of the lodestar figure requested by plaintiffs' counsel, under the circumstances of this case, is really reasonable as an a fortiori conclusion from the reasons stated here.

### Conclusion

Plaintiffs' counsel have the better of the argument on each of the contested issues here. This Court has approved both the lodestar calculation of $30,975.87 as of August 15, 1991 and the doubling of the lodestar figure as a multiplier to compensate for the risks of nonpayment.[6]

## FIRST SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

This Court's recently-issued August 19, 1991 memorandum opinion and order (the "Opinion") in part approved plaintiffs' request that a multiplier should be applied to

the lodestar figure as it was calculated in the Opinion based upon plaintiffs' petition for post-Consent-Decree attorneys' fees and the parties' ensuing memoranda. Opinion at 457–59 explained why a doubling of the lodestar figure was called for in this instance because of the risks that were and are implicit in counsels' representation of their plaintiff class member clients.

By chance the weekly output of Seventh Circuit slip opinions delivered to this Court on the same day (August 19) included one in which our Court of Appeals had just affirmed the denial of any multiplier in a section of its opinion in *Evans v. City of Evanston*, 941 F.2d 473, 477–78 (7th Cir. 1991) entitled "Fee Enhancement for Contingency." In part *Evans, id.* at 478 said:

We agree with the district court's view that the lodestar figure, the number of reasonably expended hours multiplied by an appropriate fee, is the "centerpiece of fee awards," *Blanchard v. Bergeron*, 489 U.S. 87, 94 [109 S.Ct. 939, 945, 103 L.Ed.2d 67] (1989), and that contingency enhancements above the lodestar figure are appropriate only in "cases of exceptional success." *Hensley [v. Eckerhart]*, 461 U.S. [424] at 435 [103 S.Ct. 1933, 1940, 76 L.Ed.2d 40]. *See also Blum v. Stenson*, 465 U.S. 886, 901 [104 S.Ct. 1541, 1550, 79 L.Ed.2d 891] (1984); *cf. Pennsylvania v. Delaware Valley Citizens' Counsel* [sic—should be *Council*], 483 U.S. 711, 728 [107 S.Ct. 3078, 3088, 97 L.Ed.2d 585] (plurality opinion of White, J.) ("[P]ayment for the time and effort involved—the lodestar—is presumed to be the reasonable fee authorized by [42 U.S.C. § 1988], and enhancement for the risk of non-payment should be reserved for exceptional cases where the need and justification for such en-

---

**5.** Indeed, though the literature has not dealt with the subject to this Court's knowledge, class counsel in post-consent-decree representation raising ongoing problems may even have somewhat less freedom to withdraw from representation than the outside lawyer for a client. But it is unnecessary to explore that view to decide the issues here.

**6.** Plaintiffs' counsel have also asked this Court to announce that last result as a permanent rule

for the future. That would really represent an advisory opinion, perhaps risking collision with the "case or controversy" limitation of Article III. Counsel will have to rest content with whatever assumptions they may draw from this opinion (barring any shift in the law, of course). To reflect the post-August 15 accumulation of interest (see n. 3), LOF is ordered instead to pay the sum of $31,085.58 on or before August 30, 1991.

hancement are readily apparent and are supported by evidence in the record and specific findings by the courts.").

This supplement to the Opinion is intended only to call the litigants' attention to that recent decision, for this Court adheres to the views that it expressed in the Opinion. For the reasons briefly discussed here, nothing said in *Evans* calls for a different approach to the question of a multiplier in this case.

There are really two possible reasons for a lodestar enhancement—one is a sort of bonus for counsel's having generated an extraordinary result for the client,[1] while the other reflects a recognition of risk.[2] Those factors can certainly interact, as our Court of Appeals found to be the case in *Evans*—which presented a situation of partial success and partial failure, so that the lodestar itself could arguably be viewed as embodying a kind of enhancement (a larger number) if it were compared with the product of multiplying the lawyer's regular hourly rates times the hours spent *only* on his or her successful arguments.[3]

But the potential interaction of those factors should not cause a court to conflate

---

**1.** If for example a lawyer were to develop and pursue a theory of legal liability that led to the early knuckling under of a defendant who had previously been steadfast in rejecting *any* liability to the lawyer's client—to pick an extreme example, thereby obtaining a payment of say $1 million in settlement after the lawyer had spent only 100 hours on the matter—fair and reasonable compensation for the lawyer's services surely could take that result into account. If the case were one calling for an attorneys' fee award (either under statute or under contract or under some potential fee-shifting regime under court rule or case law), an enhancement over the lawyer's straight hourly retainer rates would obviously be in order.

**2.** If a contingent-fee practitioner were successful half the time in situations where the payment of fees is dependent on obtaining an award against the litigation adversary, and if the practitioner's fees in those successful cases were limited only to the straight hourly rates that a comparable practitioner could demand and receive in representation that involves the *assured* payment of fees, he or she would effectively be working at one-half of market rates—something that would clearly discourage practitioners from entering that entire field of presumably legitimate representation. After all, even the best of lawyers cannot be certain of the successful outcome of all litigation that he or she undertakes. At a minimum, lawyers subjected to such a system would be inclined to shy away from any client whose matter was not a dead-bang winner. And if that same hypothetical contingent-fee lawyer were changed to someone with an extraordinary success rate (say 75%), presumably reflecting extraordinary ability, such a lawyer would *still* be earning less than market rates if no enhancement were allowed in the successful cases.

**3.** In *Evans* that possibility appears to have been diminished by the District Court's disallowance of a substantial portion of the hours claimed by plaintiffs' lawyers to begin with (discussed and affirmed by the Court of Appeals, 941 F.2d at 476–77). Three comments should perhaps be made about the kind of situation that *Evans* might illustrate, without depreciating the need for careful judicial scrutiny of fee petitions:

1. All of us who sit in judgment on lawyers' expenditures of time are likely to have been away for some greater or lesser period (more probably a greater period) from the business of recording and billing for our own time in the practice of law (if indeed we have ever been required to do that). And it would also seem that we must be doubly mindful of the fact that the lawyer who is involved in contingent matters, without any assurances of success (and therefore without any assurances of payment), is unlikely to pile up time on those matters needlessly—that is one place in which market forces should logically play a major role to minimize waste efforts.

2. It is extraordinarily hard, and it poses serious risks of unfairness, to make judgments from the outside and in hindsight on whether it was reasonable for the lawyer handling a case to have expended x rather than y hours of time on some aspect of a case. Those difficulties and risks are magnified when the necessarily imprecise evaluations of that nature are then extrapolated to determine the reasonableness of the *total* time spent on the case. Though that procedure certainly does involve less of a judicial burden, and though it has been approved as reasonable in *Evans*, this Court does not expect to employ it in matters on its own calendar.

3. Quite different considerations may be involved, of course, where the circumstances of the case suggest incentives for padding, or where the lawyer's method of handling the case gives reason to suspect inefficiencies that should not be countenanced. Those circumstances might include, for example, the obvious overstaffing of a case (something that tends to promote duplication of effort) or situations in which the lawyer knows early on that fee-shifting is assured, so that the question becomes not *whether* but rather *how much* the opposing party will be required to pay.

their operation. *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983) spoke of the limited use of enhancement to reward *success*—after all, a lawyer's regular hourly rate presumably already reflects that lawyer's degree of skill (and therefore that lawyer's general likelihood of success). On the other hand, Justice White's skepticism about allowing enhancement for *risk*, and his proposed limitation of such enhancement to "exceptional cases" in *Delaware Valley II*,[4] 483 U.S. 711 at 728, 107 S.Ct. at 3088 (quoted in *Evans*, at 478) was *not* at all the voice of the Court.[5] What our Court of Appeals has said about *Delaware Valley II* in *Skelton*, and this Court has then quoted in the Opinion at 457–58, remains an accurate evaluation of the legal permissibility of risk multipliers.

Hence the "yes" or "no" decision as to the granting of such a risk-reflective enhancement must (as *Skelton* says) continue to be made on the basis of factors best known to the district court, and on the basis of the discretion vested in it, "familiar as it is with the nature of the litigation ... to decide if and to what extent the plaintiffs' counsel should be compensated for risk" (860 F.2d at 258). And this Court remains of the view that this case, for the reasons already set out in the Opinion, is indeed "the model candidate for application of a multiplier—and a substantial one" (Opinion at 458).

## SECOND SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

There are some areas of the law that are commonly thought of as being in a state of rapid flux—but issues as to the applicability of contingent-fee risk enhancements of attorneys' fee awards would not ordinarily have seemed prime candidates for that label. Nonetheless this Court had no sooner issued its August 23, 1991 supplement to its August 19, 1991 memorandum opinion and order (the "Opinion") in this case—a supplement that referred to our just-issued Court of Appeals' opinion in *Evans v. City of Evanston*, 941 F.2d 473 (7th Cir.1991)—than still another newly-arrived weekly output of Seventh Circuit slip opinions, this package having been delivered to this Court on August 26, turned out to contain another brand new opinion on the same subject: *Soto v. Adams Elevator Equipment Co.*, 941 F.2d 543 (7th Cir.1991). This brief second supplement to the Opinion treats with the effect (or more accurately the lack of effect) of *Soto* on the analysis and the result announced in the Opinion.

*Soto, id.* at 553 confirms (as this Court had found in the Opinion and had then reconfirmed in its August 23 supplement) that the justification and standard for applying a risk enhancement to the lodestar figure were to be found in *Delaware Valley II*,[1] and most particularly in the swing vote of Justice O'Connor in that case—and *Soto, id.* also reconfirms the continuing viability of our own Court of Appeals' *Skelton* opinion on which this Court had relied in the Opinion and the first supplement. What *Soto, id.* has emphasized from *Delaware Valley II* is this statement by the four-Justice plurality (483 U.S. at 731, 107 S.Ct. at 3089), which also garnered Justice O'Connor's support as a fifth and controlling vote (see *id.* at 731, 107 S.Ct. at 3089):

> Before adjusting for risk assumption, there should be evidence in the record, and the trial court should so find, that without risk enhancement plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market.

From that special perspective, class counsel here are indeed in a unique position vis-a-vis that of any other putative lawyers for

---

4. This supplement will not repeat the full citations of cases already referred to in the Opinion.

5. That is, it was not and is not the Court's voice at least until subsequent changes in the Court's makeup might perhaps move into a majority position the views of the three present Justices

for whom Justice White spoke in *Delaware Valley II*.

1. As with the supplement, this second supplement will not repeat the full citations of cases referred to in the Opinion.

the plaintiff class members. It would obviously be literally impossible for the class to obtain other legal representation on anything even approaching an equivalent basis for the kinds of post-Consent-Decree services that the present class counsel has been called upon and will likely continue to be called upon to perform. It would be patently uneconomic for any new lawyer to invest the kind of time that would be required to bring himself or herself up to speed on all that has gone before in this case, in order to arm himself or herself to be able to provide any incremental services in post-decretal matters on a contingent basis.[2] What was said in Opinion at 458–59 on the subject of post-decretal issues makes the same point (albeit from a somewhat different perspective and articulated in a somewhat different way).

Accordingly this Court perceives *Soto* as still another and more authoritative confirmation of the conclusion that has been reached in the Opinion and reconfirmed in the initial supplement. This Court's original application and award of a multiplier will stand.

---

**2.** Perhaps more accurately, on the premise that everything has its price, what it would take to attract such a new lawyer to handle on a contingent basis the kinds of post-Consent-Decree problems that the present class counsel have had to deal with would have to be one of two things:

    1. the sum of (a) a guaranteed payment for the large amount of self-educative threshold activity that would be required to position the new lawyer to take on any new contingent post-decretal matters (an amount that might alone beggar the enhancement amount that this Court has awarded to the present class counsel, and that LOF would surely—and justifiably—complain about) plus (b) a contingent

fee for any successful post-Consent-Decree enforcement services (that fee would almost certainly itself carry some risk multiplier for the reasons stated in the Opinion and first supplement); or

    2. a straight contingent fee payable only for any successful enforcement services—and that fee would necessarily carry a many-fold multiplier because of the *very* large block of uncompensated time that would have to be invested by the new lawyer up front.

It does not require much in the way of sophisticated economic analysis to see that the multiplier awarded here to class counsel (twice the lodestar figure) is a bargain in comparison to the market cost of other services.